# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| **In re:** | ) | |
| | ) | |
| **JEFFREY MARK FAWCETT,** | ) | **Case No. 21–41210–169** |
| | ) | **Chapter 7** |
| | ) | **Judge Kathy A. Surratt-States** |
| **Debtor.** | ) | |
| | ) | |
| **STATE OF MISSOURI ex rel Attorney General Eric S. Schmitt,** | ) | **Adversary No. 21–4044–659** |
| | ) | |
| | ) | **PUBLISHED** |
| **Plaintiff.** | ) | |
| | ) | |
| **-V-** | ) | |
| | ) | |
| **JEFFREY MARK FAWCETT,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

The matter before the Court is the Complaint of the State of Missouri to Liquidate Claim and Determine the Corresponding Debts to be Nondischargeable (Doc. 3.); Answer (Doc. 21); Joint Stipulation of Facts (Doc. 46); Trial Brief (Doc. 49); and Plaintiff's Trial Brief (Doc. 53). A trial was held with counsel for the State of Missouri and its witnesses appearing in person and counsel for Jeffrey Mark Fawcett along with Jeffrey Mark Fawcett himself appearing in person. Upon consideration of the record as a whole, the Court makes the following **FINDINGS OF FACT:**

### A. <u>CHI Background</u>

Cardinal Home Improvements, LLC (hereinafter "CHI") was a residential construction service company providing services to consumers in Missouri from its inception in 2005 until its end on May 31, 2017. *See* Compl. Jeffrey Mark Fawcett (hereinafter "Mr. Fawcett") was the owner and president of CHI. Doc. 46 ¶ 9; *see* Compl. Mr. Fawcett organized CHI on February 18, 2005. Doc. 46 ¶ 6. By at least June 2013, Mr. Fawcett was CHI's sole owner and manager. *Id*. at 7. Mr. Fawcett also served as CHI's registered agent from the time of CHI's organization until CHI's cessation of business in 2017. *Id*. at ¶ 8.

In his role, Mr. Fawcett controlled the operations of CHI including administrative tasks, sales, and marketing. Doc. 46 ¶ 9. Mr. Fawcett maintained exclusive control over CHI's business checking account

maintained at Commerce Bank (hereinafter "Commerce Account"), which was established March 23, 2017.[1]  *Id*. at ¶ 10; *see* State Trial Ex. 46; *see also* Fawcett Trial Ex. K.  Mr. Fawcett maintained exclusive control over CHI's merchant account maintained with PNC Bank, which was established January 31, 2011 (hereinafter "PNC Account").[2]  *Id*. at ¶ 11; State Trial Ex. 45.  Mr. Fawcett also maintained final authority over CHI's payment of business debts and arranged compensation for CHI's agents and employees including himself.  *Id*. at ¶¶ 12 and 13.

## B.  The Consumer Transactions

From January 2014 to March 2017, CHI sold residential construction services to the affected consumers (hereinafter "Consumer" or "Consumers").  Doc. 46 ¶ 14.  CHI solicited Consumers through various means including door-to-door sales interactions, trade show encounters, and word of mouth.  *Id*. at ¶ 15.  Once solicited, CHI sales representatives informed Consumers that CHI could provide discounted prices on projects if an agreement was entered into on the day of the solicitation.  *Id*. at ¶ 16.  The CHI sales representatives also informed Consumers that CHI would provide the services in exchange for Consumers providing a down payment for the total project price.  *Id*. at ¶ 17.  These promises were memorialized into written agreements between Consumers and CHI (hereinafter "Residential Construction Agreement").  *Id*. at ¶ 18.  At or around the time of the execution of the Residential Construction Agreements, Consumers provided the down payments to CHI, which were deposited into the CHI Bank Accounts.  *Id*. at ¶ 19.  On some occasions, Consumers entered into separate financing agreements to fund the remainder of their projects.  *Id*. at ¶ 20.

The following Consumer transactions are at issues here:

### 1.  Salley Transaction

Bryan Salley (hereinafter "Mr. Salley") testified that in early 2014 he was approached by a CHI sales representative at his home.  Compl. ¶ 73.  The same day, Mr. Salley testified that he entered into a Residential Construction Agreement with CHI for a roof repair with a total price of $15,980.00.  Mr. Salley

---

[1] For example, on March 31, 2017, Mr. Fawcett disbursed a check for $5,000.00 to himself from this account. On April 6, 2017, Mr. Fawcett withdrew $1,212.00 from this account via an ATM located at Fairmount Park Racetrack. On April 14, 2017, Mr. Fawcett withdrew $1,000.00 from this account via ATM.

[2] The terms Commerce Account and PNC Account collectively are called the "CHI Bank Accounts."

testified that he paid a down payment in the amount of $1,598.00 to CHI at the time of signing the Residential Construction Agreement.[3]  Compl. ¶ 73.  Mr. Salley testified that CHI promised to perform the agreed to services soon after receiving the down payment.  Mr. Salley testified that he was instructed by the CHI sales representative to acquire financing to cover the remaining balance.  *See* Compl. ¶ 73.  Mr. Salley testified that the CHI sales representative further informed him that if financing was not obtained, he would receive a refund of his down payment.  *See Id.*  Mr. Salley was unable to secure financing and requested a refund of his down payment.  *Id.*  To date, CHI has not started or performed the agreed to services nor issued a refund for the total down payment to Mr. Salley in the amount of $1,598.00.  *Id.*

### 2. Ikemeier Transaction

Steve Ikemeier (hereinafter "Mr. Ikemeier") testified that on August 28, 2016 he was approached by a CHI sales representative at his home.  *See* Compl. ¶ 74.  The same day, Mr. Ikemeier testified that he entered into a Residential Construction Agreement with CHI for a deck repair with a total price of $36,382.00.  At the time of signing the Residential Construction Agreement, Mr. Ikemeier testified that he paid a down payment in the amount of $5,000.00 to CHI and agreed to obtain financing to cover the remaining balance of $31,382.00.  *See* Compl. ¶ 74.  Mr. Ikemeier testified that CHI promised to perform the agreed to services soon after receiving the down payment. On September 9, 2016, the Residential Construction Agreement was amended to include a deck extension (hereinafter "Ikemeier Change Order").  *Id.*  The total price of the Ikemeier Change Order was $41,550.00 and Mr. Ikemeier paid an additional down payment of $3,900.00.  *Id.*

Mr. Ikemeier testified that in October 2016, he contacted CHI to rescind the Ikemeier Change Order.  After speaking with a representative, Mr. Ikemeier testified that he signed the back of the Residential Construction Agreement to denote his rescission.[4]  However, on November 22, 2016, Mr. Fawcett mailed a letter to Mr. Ikemeier informing him he could not rescind but that CHI would "apply [his] down payment to [Ikemeier Change Order] or any other project in the future." State Trial Ex. 17.  In early

---

[3] No proof of payment was provided regarding the down payment however at trial Mr. Fawcett did not deny payment occurred.
[4] Also, sometime in late October, Mr. Fawcett assured Mr. Ikemeier that CHI would complete his project.  Compl. ¶ 74.

2017 in response to Mr. Fawcett's letter and again after no work began, Mr. Ikemeier testified that he decided to apply the down payments from the original Residential Construction Agreement and Ikemeier Change Order to another project. Thus, on February 9, 2017, the Ikemeier Change Order was amended to include elevation of the ground level deck (hereinafter "Ikemeier Change Order II"). State Trial Ex. 18. Mr. Ikemeier testified that Ikemeier Change Order II was amended to reflect the final total price of $14,000.00 (hereinafter "Ikemeier Change Order III").[5] State Trial Ex. 20. The total down payment Mr. Ikemeier paid for the Residential Construction Agreement, Ikemeier Change Order, Ikemeier Change Order II, and Ikemeier Change Order III was $8,900.00. Compl. ¶ 74.

Mr. Ikemeier testified that in late March 2017 he began contacting Mr. Fawcett directly through text messages on the status of his projects:

**March 31, 2017, 11:19 am**
**Ikemeier**: Jeff, this is Steve Ikemeier. Can you give me a call to discuss my deck project.

**March 31, 2017, 1:08 pm**
**Fawcett**: Steve, i am trying to line things out in all divisions. I will have a timeframe for your project by tues. sorry for delay. I had no communication of any material drop, much less a start date? Dont know why dan told you that? I will t/t you mon./no later than tues.
**Ikemeier**: Dan told me he placed the material order with 84 lumber and that the material would be delivered on March 28 and work would begin on March 29 and that my installer would be James and that you were taking over project management.

**April 4, 2017, 9:56 am**
**Mr. Fawcett**: Steve, barring any weather issues we should be dropping material late next week and james will start directly after drop. I will let you know exact dates when i have them.
**Mr. Ikemeier**: Ok. Why the delay?

**April 13, 2017, 7:39 am**
**Mr. Fawcett**: Steve, jeff w/cardinal. Wanted to update situation. Due to several factors, both internal and exterior, your project is on hold right now. I cant speak on those factors/legal actions at this time. It has always been cardinals intention to complete your job and that has not changed. I will update when i know something.
**Mr. Ikemeier**: Can you give me a call to discuss. Please give me a call. I want to talk with you.
**Mr. Fawcett**: As stated, i cant discuss now, due to possible legal implications. I just didnt want to not contact you at all.
**Mr. Ikemeier**: Jeff, you have $8,900 of my money that you have held for over 7 months and have provided nothing in return. This is not good business. I trusted in you and your company and did not pursue legal action against you. I want to know if

---

[5] Ikemeier Change Order III is illegible but Mr. Fawcett did not deny the amendments.

you are still going to be able to complete the project that I have contracted you to do? Can we meet to talk? So you are no longer going to communicate with me?

**April 27, 2017, 7:54 am**
**Mr. Ikemeier**: Jeff, this is. Steve Ikemeier. Any update on the statute of my deck?

**April 30, 2017, 6:50 am**
**Mr. Fawcett**: Steve Steve, i will try and update you by end of next. Sorry about issues and delay. Trying to get done asap. By end of next week with update.

**May 4, 2017, 9:53 am**
**Mr. Fawcett**: Well the weather has us at a standstill. Will let you know when I do.

**May 30, 2017, 8:14 am**
**Mr. Ikemeier**: Jeff, it's been several weeks since your last update on plans for my deck installation. Do you have an installation date yet?

**June 10, 2017, 6:50 am**
**Mr. Ikemeier**: Jeff, it has been another two weeks and I still have not received an update on my project. When do you plan to install my deck?

**June 12, 2017, 7:21 am**
**Mr. Ikemeier**: Jeff, what is the plan for my deck? Steve Ikemeier

State Trial Ex. 21.

To date, CHI has not performed the agreed to services nor issued a refund for the total down payment for the Residential Construction Agreement, Ikemeier Change Order, Ikemeier Change Order II, and Ikemeier Change Order III in the amount of $8,900.00. Compl. ¶ 74.

### 3. Baughman Transaction

On September 27, 2016, Barbara Baughman (hereinafter "Ms. Baughman") entered into a Residential Construction Agreement with CHI.  Doc. 46 ¶ 21. At the time of signing the Residential Construction Agreement, Ms. Baughman paid a down payment in the amount of $4,784.00 to CHI.  *Id*. CHI promised to perform the agreed to services soon after receiving the down payment.  *Id*. To date, CHI has not started or performed the agreed to services nor issued a refund for the total down payment to Ms. Baughman in the amount of $4,784.00.  *Id*.

### 4. Templeton Transaction

Jill Templeton (hereinafter "Ms. Templeton") testified that in the Fall of 2016 she learned of CHI at a home show.  After discussing the details of her patio with a CHI sales representative Ms. Templeton testified that she decided to work with CHI.  On October 7, 2016, Ms. Templeton entered into a

5

Residential Construction Agreement for a patio cover project with a total price of $5,900.00.  Compl. ¶ 76; State Trial Ex. 31.  Ms. Templeton paid a down payment in the amount of $500.00 to CHI and obtained financing to pay the remaining balance.[6]  Compl. ¶ 76.  Ms. Templeton testified that CHI promised to perform the agreed to services soon after receiving the down payment.  Ms. Templeton testified that in January of 2017 a CHI sales representative informed her that CHI was switching financing companies.  Compl. ¶ 76.  To reduce her monthly financing payments, Ms. Templeton testified that she paid $3,000.00 to CHI on January 11, 2017.  *Id.*; State Trial Ex. 32.  To date, CHI has not started or performed the agreed to services nor issued a refund for the total down payment to Ms. Templeton in the amount of $3,500.00. Compl. ¶ 76.

### 5.  Cusicks Transaction

On October 15, 2016, Erin and Kevin Cusick (hereinafter, collectively "the Cusicks") entered into a Residential Construction Agreement with CHI. Doc. 46 ¶ 22. At the time of signing the Residential Construction Agreement, the Cusicks paid a down payment in the amount of $5,244.00 to CHI.  *Id*.  CHI promised to perform the agreed to services soon after receiving the down payment.  *Id*.  On March 14, 2017, after no work began, the Cusicks contacted CHI to inquire about the delays.  *Id*.  Mr. Fawcett informed the Cusicks that CHI was awaiting a construction permit.  *Id*.  On April 17, 2017, Mr. Fawcett reassured the Cusicks that CHI still intended to perform under the Residential Construction Agreement.  *Id*.  To date, CHI has not started or performed the agreed to services nor issued a refund for the down payment to the Cusicks in the amount of $5,244.00.  *Id*.

### 6.  Wadsworths Transaction

David Wadsworth (hereinafter "Mr. Wadsworth") testified that on October 25, 2016 he was approached by a CHI sales representative at his home to solicit services for CHI.  The same day, Mr. Wadsworth and Petty Wadsworth (hereinafter, collectively "the Wadsworths") entered into a Residential Construction Agreement with CHI for a deck project with a total price of $18,000.00.  Compl. ¶ 78; State Trial Ex. 37.  The total price was reduced by $4,200.00 to account for a separate project on another

---

[6] No proof of payment was provided regarding the $500.00 down payment however at trial Mr. Fawcett did not deny payment occurred.

property.   State Trial Ex. 37.   On November 18, 2016, Mr. Wadsworth paid a down payment in the amount of $1,800.00 to CHI.  Compl. ¶ 78; State Trial Ex. 37.  The remaining balance for the deck project was $12,000.00.  State Trial Ex. 38.  Mr. Wadsworth testified that CHI promised to perform the agreed to services soon after receiving the down payment.  Mr. Wadsworth testified that following several months of delays he attempted to contact CHI through phone, letter, and in-person however all resulted in no response.  In March 2017, a CHI representative contacted the Wadsworths informing them that CHI was in the process of performing their Residential Construction Agreement.  Compl. ¶ 78.  Mr. Wadsworth testified that on April 16, 2017, he attempted to rescind the Residential Construction Agreement by signing the Notice of Cancellation but received no response.  To date, CHI has not started or performed the agreed to services nor issued a refund for the total down payment to the Wadsworths in the amount of $1,800.00.  Compl. ¶ 78.

### 7.  Robbins Transaction

Alison Robbins (hereinafter "Mrs. Robbins") testified that in the Fall of 2016, she learned of CHI at a home show.  Mrs. Robbins testified that shortly after she visited CHI to discuss a porch project at her home.  In October 2016, Mrs. Robbins testified that a CHI employee visited her home to measure her porch and discuss a potential contract for the project with CHI.  On October 28, 2016, Mrs. Robbins and Harry Robbins (hereinafter, collectively "the Robbins") entered into a Residential Construction Agreement with CHI for the porch project with a total price of $15,500.00.  Compl. ¶ 79; State Trial Ex. 25.  Mrs. Robbins paid the down payment in the amount of $5,000.00 to CHI.  Compl. ¶ 79.; State Trial Ex. 26.  After the engineering drawings were approved for the porch project, Mrs. Robbins testified that CHI promised to perform under the Residential Construction Agreement between January and February of 2017.  Mrs. Robbins testified that January and February 2017 came and went, and she attempted to contact CHI through phone, letter, and in-person however all resulted in no response.  Mrs. Robbins also testified that she filed a complaint through the Better Business Bureau to which Mr. Fawcett responded that work would begin soon.  Compl. ¶ 79.  Mrs. Robbins testified that on May 3, 2017, Mr. Fawcett received a letter from her requesting to cancel her Residential Construction Agreement however she received no response.  Compl. ¶ 79; State Trial Ex. 27.  To date, CHI has not started or performed the

agreed to services nor issued a refund for the total down payment to Mrs. Robbins in the amount of $5,000.00.  Compl. ¶ 79.

### 8.  Gatewoods Transaction

On October 29, 2016, Jessica and Jordan Gatewood (hereinafter, collectively "the Gatewoods") entered into a Residential Construction Agreement with CHI.  Doc. 46 ¶ 23.  At the time of signing the Residential Construction Agreement, the Gatewoods paid a down payment in the amount of $880.00 by a personal check.  *Id*.  CHI promised to perform the agreed to services soon after receiving the down payment.  *Id*. The Gatewoods instructed CHI to wait until November 4, 2016, to deposit the check to prevent an overdraft of their account. *Id*. On November 1, 2016, CHI deposited the check causing the Gatewoods to incur $105.00 in overdraft fees, which CHI subsequently reimbursed.  *Id*.  In response, the Gatewoods sought to rescind their Residential Construction Agreement but Mr. Fawcett denied their request informing them that they would instead receive a $880.00 credit towards a future project.  *Id*. The Gatewoods accepted and attempted to use the credit in May 2017 on a new project but CHI would not return their calls.  *Id*.  To date, CHI has not started or performed the agreed to services nor issued a refund for the total down payment to the Gatewoods in the amount of $880.00.  *Id*.

### 9.  Madras Transaction

Peggy Madras (hereinafter "Ms. Madras") testified that on October 30, 2016, she was approached by a CHI sales representative at her home to solicit services for CHI.  The next day, Ms. Madras entered into a Residential Construction Agreement with CHI for a siding project with a total price of $15,154.00. Compl. ¶ 80; State Trial Ex. 22.  Ms. Madras paid a down payment in the amount of $5,000.00 to CHI. *Id*.  Ms. Madras testified that CHI promised to perform the agreed to services soon after receiving the down payment.  Ms. Madras testified that following several months of delays, she attempted to contact CHI through phone and in-person however both resulted in no response.  *See* Compl. ¶ 80.  Ms. Madras testified that in April 2017, she filed a complaint through the Better Business Bureau but received no response from Mr. Fawcett.  *Id*.  Ms. Madras testified that on May 17, 2017, Mr. Fawcett informed her that work would begin soon on her project.  *Id*.  To date, CHI has not started or performed the agreed to services nor issued a refund for the total down payment to Ms. Madras in the amount of $5,000.00.  *Id*.

8

**10. Van Horns Transaction**

James Van Horn (hereinafter "Mr. Van Horn") testified that he was familiar with CHI from a previous project the company completed for him in 2010.  Mr. Van Horn testified that in the Fall of 2016, he was approached by a CHI sales representative at his home to solicit services for CHI.  On November 2, 2016, Mr. Van Horn and Tracy Van Horn (hereinafter, collectively "the Van Horns") entered into a Residential Construction Agreement with CHI for a basement remodel project with a total price of $34,000.00.  Compl. ¶ 81; State Trial Ex. 36.  Mr. Van Horn testified that he paid a down payment in the amount of $11,000.00 through credit card and obtained financing through Synchrony Bank to cover the remaining balance.  *See* Compl. ¶ 81.  Mr. Van Horn testified that CHI promised to perform the agreed to services in January 2017.   Mr. Van Horn testified that in January 2017, he contacted a CHI representative on the status of his basement remodel project to which the CHI representative informed him that work would begin on his project in March 2017.   Mr. Van Horn testified that during this time, CHI purchased and delivered to the Van Horns' home $1,559.67 worth of wood and other materials from Home Depot.   *See* Compl. ¶ 81.  Mr. Van Horn testified that in March 2017, subcontractors began working on his basement remodel project however Mr. Van Horn paid them a day's work due to CHI failing to compensate them.  *Id*.  Mr. Van Horn testified that following the day's work on the basement remodel project, work ceased.  *Id*.  Mr. Van Horn testified that he attempted to contact CHI through phone, email, and letter however all resulted in no response.  Mr. Van Horn testified that on April 1, 2017, he received a chargeback from his credit card of the $11,000.00 down payment however Mr. Fawcett successfully disputed the chargeback asserting that CHI would complete the basement remodel project.  Compl. ¶ 81.  To date, CHI has not performed or completed the agreed to services nor issued a refund for the down payment less the materials delivered from Home Depot to the Van Horns in the amount of $9,440.33.[7]  *Id*.

---

[7] In the Complaint, the State provides the alleged amount as $9,377.83.  *See* Compl. ¶ 81. However, using the amounts provided in the Complaint and State Trial Ex. 36, the alleged amount owed to the Van Horns is as stated.

### 11. Velker Transaction

On November 8, 2016, Kathleen Velker (hereinafter "Ms. Velker") entered into a Residential Construction Agreement with CHI.  Doc. 46 ¶ 24.  At the time of signing the Residential Construction Agreement, Ms. Velker paid a down payment in the amount of $20,000.00.  *Id*. On January 1, 2017, a CHI representative accompanied Ms. Velker to several retailers to look at construction materials for her project.  *Id*.  At this time, Ms. Velker paid an additional $19,788.00 on her project. A CHI representative told Ms. Velker that CHI would begin work on her project by the end of January 2017.  *Id*.  On March 9, 2017, CHI performed some demolition work for Ms. Velker and ordered materials valued at approximately $1,000.00 from Home Depot however no progress since then was made on her project.  *Id*.  To date, CHI has not completed the agreed to services nor issued a refund for the down payment less the materials from Home Depot and additional payment to Ms. Velker in the amount of $38,788.00.[8]  *Id*.

### 12. Weeks Transaction

On December 1, 2016, William Weeks (hereinafter "Mr. Weeks") entered into a Residential Construction Agreement with CHI.  Doc. 46 ¶ 25.  At the time of signing the Residential Construction Agreement, Mr. Weeks paid a down payment in the amount of $753.00 to CHI.  *Id*.  On February 1, 2017, a CHI representative visited Mr. Weeks's home to take measurements for the project however no progress since then was made.  *Id*.  To date, CHI has not started or performed the agreed to services nor issued a refund for the total down payment to Mr. Weeks in the amount of $753.00.  *Id*.

### 13. Hafner Transaction

On December 30, 2016, Joseph Hafner (hereinafter "Mr. Hafner") entered into a Residential Construction Agreement with CHI for a kitchen remodel project with a total price of $21,423.00 with a $7,100.00 down payment.  *See* Compl. ¶ 85; State Trial Ex. 10.  The same day, Mr. Hafner paid $4,100.00 of the down payment via his Wells Fargo credit card and the remaining $3,000.00 through check.  Compl. ¶ 85; State Trial Ex. 10 and 12.  Mr. Hafner testified that the remaining balanced was to

---

[8] In the Complaint, the States provides the alleged approximate amount as $38,557.73.  *See* Compl. ¶ 83. However, using the amounts provided in the Complaint the alleged owed amount owed to Ms. Velker is as stated.

be financed.  Mr. Hafner testified that CHI promised to perform the agreed to services with a completion date of February 2017.   Mr. Hafner testified that in late February 2017, he spoke with a CHI representative and Mr. Fawcett who assured him the kitchen remodel project would begin soon.  *See* Compl. ¶ 85.  Mr. Hafner testified that after no work began on the kitchen remodel project, he filed a complaint with the Missouri Attorney General.   Mr. Hafner testified that he was able to receive a chargeback of the $4,100.00 portion of the down payment from his Wells Fargo credit card however he has not received a refund for the remaining $3,000.00 paid by check.  *See* Compl. ¶ 85.  To date, CHI has not started or performed the agreed to services nor issued a refund for the remaining down payment to Mr. Hafner in the amount of $3,000.00.  *Id*.

### 14. Speicher Transaction

David Speicher (hereinafter "Mr. Speicher") testified that he was familiar with CHI from a previous project the company completed for him in 2016.  Mr. Speicher testified that six months after the previous project's completion, he was approached by a CHI sales representative at his home to solicit services for CHI.  On January 6, 2017, Mr. Speicher entered into a Residential Construction Agreement with CHI for a fence replacement project with a total price of $7,039.00 with a $2,500.00 down payment.  Compl. ¶ 86; State Trial Ex. 29.  Mr. Speicher testified that his father paid the $2,500.00 down payment by check. Compl. ¶ 86; State Trial Ex. 30.  Mr. Speicher testified that after receiving the down payment, CHI promised to perform the agreed to services in early Spring of 2017. To date, CHI has not started or performed the agreed to services nor issued a refund for the down payment to Mr. Speicher in the amount of $2,500.00.  Compl. ¶ 86.

### 15. Bradys Transaction

On January 16, 2017, Martin and Amber Brady (hereinafter, collectively "the Bradys") entered into a Residential Construction Agreement with CHI.  Doc. 46 ¶ 26.  At the time of signing the Residential Construction Agreement, the Bradys paid a down payment in the amount of $3,000.00 to CHI.  *Id*.  To date, CHI has not started or performed the agreed to services nor issued a refund for the total down payment to the Bradys in the amount of $3,000.00.  *Id*.

### 16. Hardin Transaction

On January 19, 2017, Rochelle Hardin (hereinafter "Ms. Hardin") entered into a Residential Construction Agreement with CHI.  Doc. 46 ¶ 27.  At the time of signing the Residential Construction Agreement, Ms. Hardin paid a down payment in the amount of $500.00 to CHI.  *Id.*  To date, CHI has not started or performed the agreed to services nor issued a refund for the total down payment to Ms. Hardin in the amount of $500.00.  *Id.*

### 17. Blank Transaction

Linda Blank (hereinafter "Ms. Blank") testified that in January 2017, she was approached by a CHI sales representative at her home to solicit services for CHI.  On January 17, 2017, Ms. Blank entered into a Residential Construction Agreement with CHI for a deck replacement project with a total price of $27,744.00.  *See* Compl. ¶ 89; State Trial Ex. 6.  On January 21, 2017, Ms. Blank paid the down payment in the amount of $9,155.00 by check. Compl. ¶ 89; State Trial Ex. 7.  The Residential Construction Agreement called for the remaining balance of $18,589.00 to be paid in two parts: $9,155.00 to be paid upon delivery of the materials and $9,434.00 to be paid upon the deck replacement project's completion.  State Trial Ex. 6.  Ms. Blank testified that CHI promised to begin performing the agreed to services in late February or early March 2017.  Ms. Blank testified that around March or April 2017, she attempted to contact CHI however received no response.  Ms. Blank testified that on April 25, 2017, she filed a complaint through the Better Business Bureau to which Mr. Fawcett responded promising to complete her deck replacement project.  Compl. ¶ 89.  To date, CHI has not started or performed the agreed to services nor issued a refund for the total down payment to Ms. Blank in the amount of $9,155.00.  *Id.*

### 18. Edingers Transaction

On January 25, 2017, Barbara and Charles Edinger (hereinafter, collectively "the Edingers") entered into a Residential Construction Agreement with CHI.  Doc. 46 ¶ 28.  At the time of signing the Residential Construction Agreement, the Edingers paid a down payment in the amount of $5,000.00 to CHI.  *Id.*  To date, CHI has not started or performed the agreed to services nor issued a refund for the total down payment to the Edingers in the amount of $5,000.00.  *Id.*

**19. Heiser Transaction**

On January 26, 2017, Bruce Heiser (hereinafter "Mr. Heiser") entered into a Residential Construction Agreement with CHI.  Doc. 46 ¶ 29.  At the time of signing the contract, Mr. Heiser paid a down payment in the amount of $1,000.00 to CHI.  *Id*.  On February 3, 2017, Mr. Heiser spoke with a CHI representative about the status of his project.  *Id*.  The CHI representative informed Mr. Heiser that CHI would not be able to finance the remainder of the project and requested Mr. Heiser pay an additional $1,000.00, which Mr. Heiser provided.  *Id*. To date, CHI has not started or performed the agreed to services nor issued a refund to Mr. Heiser of $2,000.00 inclusive of the down payment and additional payment.  *Id*.

**20. Fulmer Transaction**

On February 7, 2017, Robert Fulmer (hereinafter "Mr. Fulmer") entered into a Residential Construction Agreement with CHI.  Compl. ¶ 92.  The same day, Mr. Fulmer paid a down payment in the amount of $1,000.00 with the remaining balance to be financed interest free for at least 18 months.  *Id*. Shortly after the signing of the Residential Construction Agreement, a CHI representative informed Mr. Fulmer that the interest-free financing was not available.  *Id*.  Mr. Fulmer attempted to rescind the Residential Construction Agreement however received no response.  *Id*.  To date, CHI has not started or performed the agreed to services nor issued a refund for the down payment to Mr. Fulmer in the amount of $1,000.00.  *Id*.

**21. Cross Transaction**

John Cross (hereinafter "Mr. Cross") testified that on February 10, 2017, he was approached by a CHI sales representative at his home to solicit services for CHI.  The same day, Mr. Cross entered into a Residential Construction Agreement with CHI for a wood column replacement project with a total price of $5,476.00.  Compl. ¶ 93; State Trial Ex. 8.  On February 12, 2017, Mr. Cross paid the down payment in the amount of $1,842.00 by check.  Compl. ¶ 93; State Trial Ex. 9.  Mr. Cross testified that a CHI representative informed him that the wood column replacement project would take between four and six weeks and that CHI would begin performing the agreed to services soon.  Mr. Cross testified that in March 2017, he spoke with a CHI project manager on the status of his wood column replacement project

13

who informed him that CHI was waiting on half of the materials and to give CHI two more weeks to begin work.  Mr. Cross testified that in April 2017, after more than two weeks passed, he attempted to contact CHI on the status of his wood column replacement project however received no response.  To date, CHI has not started or performed the agreed to services nor issued a refund for the total down payment to Mr. Cross in the amount of $1,842.00.  Compl. ¶ 93.

### 22. Wray Transaction

On February 11, 2017, Stephen Wray (hereinafter "Mr. Wray") entered into a Residential Construction Agreement with CHI.  Compl. ¶ 94.  The same day, Mr. Wray paid a down payment in the amount of $1,500.00.  *Id*.  To date, CHI has not started or performed the agreed to services nor issued a refund for the down payment to Mr. Wray in the amount of $1,500.00.

### 23. Warren Transaction

Amanda Warren (hereinafter "Ms. Warren") testified that she was familiar with CHI through her daughter who recommended the company to her.  Ms. Warren testified that in February 2017, she contacted CHI inquiring about their services for a pergola project.  On February 20, 2017, Ms. Warren entered into a Residential Construction Agreement with CHI for the pergola project with a total price of $5,669.00.  Compl. ¶ 95; State Trial Ex. 39.  The same day, Ms. Warren paid the down payment in the amount of $1,890.00 by check.  Compl. ¶ 95; State Trial Ex. 40.  Ms. Warren testified that a CHI representative informed her that the company needed to obtain a permit prior to building the pergola.  Ms. Warren testified that she provided CHI with a plat map to assist with CHI obtaining the permit.  Compl. ¶ 95.  Ms. Warren testified a CHI representative informed her that CHI would provide her a start date once CHI received the materials.  Ms. Warren testified that she continuously contacted CHI on the status of her pergola project however was constantly told CHI was awaiting the permit and materials.  Ms. Warren testified that on March 15, 2017, she spoke with Mr. Fawcett about the delays to which Mr. Fawcett informed her that CHI could not obtain the permit required to do the project.  Compl. ¶ 95.  Ms. Warren testified that on June 1, 2017, she sent Mr. Fawcett a letter requesting a refund and rescission of the Residential Construction Agreement however received no response.  *Id*.  To date, CHI has not started

or performed the agreed to services nor issued a refund for the total down payment to Ms. Warren in the amount of $1,890.00.  *Id*.

### 24. Motts Transaction

Jamie Motts (hereinafter "Ms. Motts") testified that she was approached by a CHI sales representative at her home to solicit services for CHI.  Ms. Motts testified that she set up an appointment with CHI to discuss a potential fence project and financing.  On February 20, 2017, Ms. Motts entered into a Residential Construction Agreement with CHI for the fence project with a total price of $6,360.00.  *See* Compl. ¶ 96; State Trial Ex. 24.  The same day, Ms. Motts paid the down payment in the amount of $2,120.00 by check.  Compl. ¶ 96.  Ms. Motts testified that a CHI representative informed her that CHI would deliver the materials to her home in three weeks following the signing of the Residential Construction Agreement.  Ms. Motts testified that after the three weeks passed, she contacted CHI on the status of her fence project however received no response.  Ms. Motts testified that she drove to CHI to speak with a CHI representative in person however the company's doors were locked but there was a note containing a phone number on the door.  Ms. Motts testified that she called the number but received no response.  To date, CHI has not started or performed the agreed to services nor issued a refund for the total down payment to Ms. Motts in the amount of $2,120.00.  Compl. ¶ 96.

### 25. Triplett Transaction

Tracey Triplett (hereinafter "Ms. Triplett") testified that on February 22, 2017, a CHI representative came to her home to fix her fence and, while fixing the fence, asked if she needed CHI to complete any additional projects on her home.  Ms. Triplett testified that the CHI representative informed her that if she entered into an agreement with CHI that day she would receive a discount on the service.  Thus, that day, Ms. Triplett entered into a Residential Construction Agreement with CHI for a patio cover project with a total price of $12,128.00 with a down payment in the amount of $4,000.00.  Compl. ¶ 97; State Trial Ex. 33 and 34.  Ms. Triplett paid $2,000.00 towards the down payment by check that day and the remaining $2,000.00 through a credit card the following day on February 23, 2017.  Doc. 46 ¶ 33; State Trial Ex. 33 and 34.  Ms. Triplett testified that the CHI representative informed her that CHI would begin her patio cover project in 30 days and complete it by April 2017.  Ms. Triplett testified that in March 2017, after

15

having second thoughts on the patio cover project, she mailed CHI a letter seeking to rescind the Residential Construction Agreement.  *See* Compl. ¶ 97.  However, Ms. Triplett testified that Mr. Fawcett left her a voicemail stating that she could not cancel the Residential Construction Agreement.  *Id*.  Ms. Triplett elected to proceed with the patio cover project.  *Id*.  CHI and Ms. Triplett amended the Residential Construction Agreement on March 14, 2017, through a change order confirming her decision to not rescind the agreement.  State Trial Ex. 35.  Ms. Triplett testified that at this time she was informed her patio cover project would be completed by Spring 2017.  Ms. Triplett testified that in April 2017, she attempted to contact CHI and Mr. Fawcett on the status of her patio cover project however received no response.  Ms. Triplett testified that she filed a Better Business Bureau and small claims complaint to which both resulted in no response.  Ms. Triplett testified that she was able to receive half of the down payment paid though her credit card through chargeback however has not received the other $2,000.00 paid by check.  *See* Doc. 46 ¶ 33.  To date, CHI has not started or performed the agreed to services nor issued a refund for the down payment portion paid by check to Ms. Triplett in the amount of $2,000.00.[9] *Id*.

### 26. Hayes Transaction

On February 24, 2017, Sonja Hayes (hereinafter "Ms. Hayes") entered into a Residential Construction Agreement with CHI.  Compl. ¶ 98.  The same day, Ms. Hayes paid a down payment in the amount of $1,734.00.  *Id*.  To date, CHI has not started or performed the agreed to services nor issued a refund for the down payment to Ms. Hayes in the amount of $1,734.00.  *Id*.

### 27. Stone Transaction

On February 25, 2017, Brian Stone (hereinafter "Mr. Stone") entered into a Residential Construction Agreement with CHI.  Doc. 46 ¶ 30.  At the time of signing the Residential Construction Agreement, Mr. Stone paid a down payment in the amount of $2,000.00 to CHI.  *Id*.  To date, CHI has not started or performed the agreed to services nor issued a refund for the total down payment to Mr. Stone in the amount of $2,000.00.  *Id*.

---

[9] In the Complaint, the State provides the alleged amount as $4,000.00.  *See* Compl. ¶ 97. However, using the amounts stated in Ms. Triplett's testimony and the stipulated facts, the alleged amount owed to Ms. Triplett is as stated.  *See* Doc. 46 ¶ 33.

**28. Willard Transaction**

James Willard (hereinafter "Mr. Willard") testified that on March 2, 2017, he was approached by a CHI sales representative at his home to solicit services for CHI.  The same day, Mr. Willard entered into a Residential Construction Agreement with CHI for a deck replacement project with a total price of $7,700.00.  Compl. ¶ 100; State Trial Ex. 42 and 43. Mr. Willard paid the down payment in the amount of $2,500.00 by check the same day.  Compl. ¶ 100; State Trial Ex. 43.  Mr. Willard testified that the CHI representative informed him that CHI would begin work on the deck replacement project in eight weeks. Mr. Willard testified that in May 2017, after not hearing from CHI, he went to CHI to speak with a CHI representative but the doors were locked.  To date, CHI has not started or performed the agreed to services nor issued a refund for the total down payment to Mr. Willard in the amount of $2,500.00. Compl. ¶ 100.

**29. Klein Transaction**

On March 7, 2017, David Klein (hereinafter "Mr. Klein") entered into a Residential Construction Agreement with CHI.  Doc. 46 ¶ 31.  At the time of signing the Residential Construction Agreement, Mr. Klein paid a down payment in the amount of $14,193.00 to CHI.  *Id*.  To date, CHI has not started or performed the agreed to services nor issued a refund for the total down payment to Mr. Klein in the amount of $14,193.00.  *Id*.

**30. Busch Transaction**

On March 9, 2017, Joan Busch (hereinafter "Ms. Busch") entered into a Residential Construction Agreement with CHI.  Doc. 46 ¶ 32.  At the time of signing the Residential Construction Agreement, Ms. Busch paid a down payment in the amount of $5,365.00.  *Id*.  To date, CHI has not started or performed the agreed to services nor issued a refund for the total down payment to Ms. Busch in the amount of $5,365.00.  *Id*.

**31. Simon Transaction**

On March 10, 2017, Lisa Simon (hereinafter "Ms. Simon") entered into a Residential Construction Agreement with CHI.  Compl. ¶ 103.  The same day, Ms. Simon paid a down payment in the amount of

17

$100.00.  *Id*.  To date, CHI has not started or performed the agreed to services nor issued a refund for the down payment to Ms. Simon in the amount of $100.00.  *Id*.

**32. Cahalin Transaction**

In February 2017, Mary Cahalin (hereinafter "Ms. Cahalin") paid CHI $9,000.00 for the construction of a fence, which CHI completed.  Compl. ¶ 104.  On March 1, 2017, Ms. Cahalin entered into a Residential Construction Agreement with CHI for a kitchen remodel project.  *Id*.  At the time of signing the Residential Construction Agreement, Ms. Cahalin paid a down payment in the amount of $1,000.00 to CHI.  *Id*.  On March 17, 2017, following CHI's request, Ms. Cahalin paid an additional $2,200.00 so CHI could purchase the supplies for the kitchen remodel project.  *Id*. However, on April 18, 2017, a CHI subcontractor served Ms. Cahalin with a notice of intent to place a lien on her property in the amount of $4,124.25 for CHI's failure to pay for the materials used to install the fence.  *Id*.  Ms. Cahalin paid $4,124.25 to the subcontractor to avoid the lien.  *Id*.  To date, CHI has neither started or performed the agreed to services on the kitchen remodel project nor issued Ms. Cahalin a refund for the down payment and additional payment in the total amount of $3,200.00 nor reimbursed the amount paid to the subcontractor in the amount of $4,124.25.  *Id*.

**C.  The Residential Construction Agreement**

The Residential Construction Agreements entered between CHI and the Consumers contained similar contractual terms.  Paragraph 9 discussed the terms for delay and emphasized that there is no condition for completion of the projects by a specific date:

> 9.  DELAY. The Seller is not responsible for delay or inability to perform caused by strikes, acts of God, war, riots, shortages, weather conditions, public authorities or other causes or causalities beyond Seller's control or due to the Buyer.  The Buyer agrees that time is not of the essence to this contract and that the Buyer's obligations to pay and perform under this contract is not conditioned on the Seller's completion of work or delivery of materials by any certain date.

Fawcett Trial Ex. H ¶ 9.

Paragraph 10 discussed the breach of damages provisions available to CHI in the event of the Consumers' breach:

18

> 10. DAMAGES. If the Buyers commits any breach hereof or repudiate this agreement, the Buyer agrees to pay to the Seller as liquidated damages, and not as a penalty, a sum equal to 25% of the Seller's full regular price. The full regular price shall consist of all work and materials (whether custom or non-custom made materials) as contracted for herein; regardless of whether such work has been performed or such materials have been installed.
>
> In addition, the Buyer agrees to pay all costs of collection, including but not limited to court costs and reasonable attorney's fee, and understands that his/her down payment shall be forfeited and non-refundable.
>
> The damages set forth herein shall be in addition to any other damages or loss, incidental or consequential, suffered by the Seller on account of Buyer's breach or repudiation.

Fawcett Trial Ex. H ¶ 10.

Finally, the Notice of Cancellation provision discussed the parameters for how the Consumers could rescind their Residential Construction Agreement:

> NOTICE OF CANCELLATION – IF THIS AGREEMENT WAS SOLICITED AT YOUR RESIDENCE AND YOU DO NOT WANT THE GOODS OR SERVICES, YOU MAY CANCEL, WITHOUT FURTHER OBLIGATION, THIS AGREEMENT BY MAILING THIS NOTICE TO THE SELLER AT THE ADDRESS SHOWN BELOW AT ANY TIME PRIOR TO MIDNIGHT OF THE THIRD BUSINESS DATE AFTER THE DATE OF THIS TRANSACTION. SELLER WILL THEN CANCEL ALL CONTRACTS AND NEGOTIABLE INSTRUMENTS EXECUTED BY YOU AND RETURN ANY PROPERTY GIVEN BY YOU TO SELLER WITHIN 10 DAYS FROM DATE OF TRANSACTION.

Fawcett Trial Ex. H p. 2.

**D.  Bankruptcy Proceeding**

The State of Missouri at the relation of Attorney General Eric Schmitt (hereinafter the "State") received numerous complaints from the Consumers concerning CHI's business practices.   See Trial Ex. 1.  From April 5, 2017, to April 20, 2017, the State sent CHI four of the Consumers' letters concerning the complaints and invited CHI to respond.  *Id*.  The four letters informed CHI of the State's authority to investigate and prosecute these complaints as consumer fraud violations.  *Id*.  Between April 15, 2017 and April 24, 2017 Mr. Fawcett responded to the four letters stating that CHI was not closed and was making efforts to rectify the Consumers' complaints.  *See* Trial Ex. 2.

On July 11, 2018, the State filed a class action suit against Mr. Fawcett and CHI in St. Charles Circuit Court in an action *State of Missouri v. Jeffrey M. Fawcett et al.*, (hereinafter "State Court Action"). On April 1, 2021, Mr. Fawcett filed a Voluntary Petition under Chapter 7 of the Bankruptcy Code.  On May 5, 2021, the State Court entered the Consent Order of Stay & Permanent Injunction (hereinafter "Consent Order") staying the State Court Action until the bankruptcy proceeding was resolved.  Fawcett Trial Ex. C p. 1.  The Consent Order also permanently enjoined Mr. Fawcett and all persons acting at his direction "from having an ownership interest in, or otherwise exercising control over, a company that advertises, solicits, sells, or collects payment for home repair, renovation, demolition, or construction services in Missouri."  *Id.* at p. 2.

On July 6, 2021, the State representing the Consumers as a class filed Complaint of The State of Missouri To Liquidate Claim And Determine The Corresponding Debts To Be Nondischargeable (Doc. 3) (hereinafter "Complaint").  In the Complaint, the State seeks to liquidate its monetary claims against Mr. Fawcett pursuant to the Missouri Merchandising Practices Act (hereinafter "MMPA") and to determine that the Consumers' payments are nondischargeable under the Bankruptcy Code.  *See* Compl. Pursuant to Missouri law, the State seeks monetary judgments for Mr. Fawcett's alleged violation of the MMPA: $156,019.81 as restitution to the Consumers under Mo. Rev. Stat. § 407.100.4; $15,601.98 as a credit under Mo. Rev. Stat. § 407.140.3; $32,000.00 as a penalty for each violation under Mo. Rev. Stat. § 407.100.6; and pre-petition costs to investigate and prosecute under Mo. Rev. Stat. § 407.130.  *Id.* at ¶¶ 27-29.  The State also argues the MMPA monetary judgments are nondischargeable in bankruptcy pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (a)(7).  *Id.* at ¶¶ 29-31.

In response, on September 22, 2021, Mr. Fawcett filed an Answer (Doc. 21) denying liability under the MMPA and §§ 523(a)(2)(A) and (a)(7).[10]  Mr. Fawcett admits to taking the down payments without providing a service or issuing a refund to only 12 of the Consumers, denied as to four of the Consumers and was unsure of the remaining 16 Consumers due to lack of sufficient information.  The 12 Consumers Mr. Fawcett concedes to taking their down payments without providing a service or refund

---

[10] Mr. Fawcett also states that the State is barred under the doctrine of unclean hands from recovering under the MMPA and §§ 523(a)(2)(A) and (a)(7) in whole or in part.

are Ms. Baughman, the Cusicks, the Gatewoods, Ms. Velker, Mr. Weeks, the Bradys, Ms. Hardin, the Edingers, Mr. Heiser, Mr. Stone, Mr. Klein, and Ms. Busch.   See Doc. 21.

The parties conducted discovery leading up to trial.[11]   The parties also filed a stipulation of facts, trial briefs, exhibits, and other trial documents in preparation for the trial.

### E.   The Trial

A two-day trial was held on February 8 and 9, 2022 on the Complaint with counsel appearing for the State; 15 of the Consumers appearing as witnesses for the State;[12] three former CHI employees, James Johnson, Neil Harrison, and Paul Eilerman, appearing as witnesses for the State; Joseph Mundle, an investigator for the State, appearing as a witness for the State; John Vaclavek appearing as an expert witness for the State; counsel appearing for Mr. Fawcett; and Mr. Fawcett himself appearing as a witness.  The State and Mr. Fawcett presented several exhibits.  The State's admitted exhibits included Residential Construction Agreements and Change Orders, proofs of payment, letters and text messages, Mr. Fawcett Wages For 2016 & 2017, Cash Withdrawals from CHI Business Accounts and CHI's 2014, 2016, and 2017 Tax Returns.  Mr. Fawcett's admitted exhibits include Sharon Ruebel's Bank of America March 22, 2017 Statement, PNC 8905 – Cardinal Home Improvement Check April 2017, and Commerce 0094 – Bank Statements – March through March 2017.

#### 1.   Former CHI Employees' Testimony

James Johnson (hereinafter "Mr. Johnson") was employed as a sales representative at CHI from January 2011 until February 2017.  Mr. Johnson testified to the daily operations in the sales department at CHI: every evening, Mr. Fawcett would leave a voicemail for the sales representatives of potential leads; the following morning, the sales representatives would listen to Mr. Fawcett's voicemail to obtain their leads; and after obtaining their leads, the sales representatives would connect with the consumers. Mr. Johnson testified that Mr. Fawcett was the primary person who would find the leads.  Mr. Johnson

---

[11]  The State also filed and this Court previously ruled on Plaintiffs' Motion for Adverse Interference Against Defendant Fawcett as a Sanction For His Destruction of Evidence requesting this Court sanction Mr. Fawcett for alleged intentional destruction of CHI's business records in July 2017 for the purpose of suppressing the truth. Doc. 37.  This Court denied the motion finding Mr. Fawcett did not have the requisite intent to anticipate litigation or suppress the truth when he destroyed all of CHI's business records.

[12] The Consumers who testified were: Ms. Blank, Mr. Willard, Mr. Speicher, Ms. Robbins on behalf of the Robbins, Mr. Wadsworth on behalf of the Wadsworths, Ms. Warren, Ms. Madras, Ms. Triplett, Ms. Motts, Mr. Salley, Ms. Templeton, Mr. Ikemeier, Mr. Hafner, Mr. Van Horn on behalf of the Van Horns, and Mr. Cross.

testified that the project prices were based on the project, measurements, and price book that Mr. Fawcett created.  To report results from the leads, Mr. Johnson testified the sales representatives would call Mr. Fawcett and inform him of the results (i.e., whether a Residential Construction Agreement was entered or not).  Mr. Johnson also testified that his paychecks began to diminish towards the end of his time at CHI. Mr. Johnson also testified that towards the end of his time at CHI, CHI cancelled his health insurance.

Neil Harrison (hereinafter "Mr. Harrison") was employed as a sales representative at CHI for over eight months.  Mr. Harrison testified to the same sales structure as Mr. Johnson stated: every evening, Mr. Fawcett would leave a voicemail to the sales representatives of potential leads; the following morning, the sales representatives would listen to Mr. Fawcett's voicemail to obtain their leads; and after obtaining their leads, the sales representatives would connect with the consumers.  Mr. Harrison testified that he had to report the results of the leads to Mr. Fawcett at the end of the day.  Mr. Harrison testified that he was paid according to a pay structure wherein his compensation was based primarily on a profit split system.  Mr. Harrison testified that he left CHI because of low pay, which he says was caused by the lack of sales and project incompletions.

Paul Eilerman (hereinafter "Mr. Eilerman") was a former production manager at CHI until October 2016.  Mr. Eilerman testified that as a production manager he oversaw the sales representatives, permits, ordered materials, and responsible for sending the subcontractors to do projects.  Mr. Eilerman testified that in the beginning of his time at CHI, the company would pay the suppliers for the project materials later.  However, Mr. Eilerman testified that shortly before leaving CHI, the company was required to pay the suppliers upfront.  Mr. Eilerman testified that during this time where payment was required upfront Mr. Fawcett instructed him to hold off on his job until the money for the suppliers came in.  Mr. Eilerman further testified that in the beginning of his time at CHI, the finance company would finance a project once it was completed however shortly before Mr. Eilerman left the finance company required upfront payment as well.

22

### 2. Mundle's Testimony

Joseph Mundle (hereinafter "Mr. Mundle") is an investigator for the State who reviewed the Consumers' complaints. Mr. Mundle testified that through his investigation he gathered: the Consumers paid a down payment but received little to no work and Mr. Fawcett was the only authorized administrator on the Commerce Account and PNC Account. State Trial Ex. 45–48. Mr. Mundle testified that he did not believe the funds withdrawn from the Commerce Account or PNC Account from 2016 to 2017 were used towards the Consumers' projects because most if not all of the Consumers did not receive the materials needed for their projects and none of the Consumers' projects were complete. *See Id.* at 47 and 48.

### 3. Vaclavek's Testimony

John Vaclavek (hereinafter "Mr. Vaclavek") is an accountant who was retained by the State to investigate the financial condition of CHI during the period of August 2016 and March 2017. Mr. Vaclavek presented his investigative findings at trial.[13] Mr. Vaclavek testified that he used schedules and balance sheets from CHI's income tax returns[14] for 2014, 2016, and 2017 to gather his findings. Mr. Vaclavek testified that CHI was undercapitalized and insolvent prior to August 2016. Table 1 shows CHI's undercapitalization and insolvency for the investigative period:[15]

**Table 1**

|  | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|
| **Undercapitalization** |  |  |  |  |
| Members' Capital Accounts | $345,643 | $341,066 | $531,798 | $636,786 |
| **Insolvency** |  |  |  |  |
| Capitalization | $345,643 | $341,066 | $531,798 | $636,786 |
| Less: Net Book Value of Fixed Assets | $10,990 | $10,634 | $10,278 | $9,922 |
| Add: Fair Value of Fixed Assets | $52,395 | $52,395 | $52,395 | $52,395 |
| **Insolvency** | *$304,238* | *$299,305* | *$489,681* | *$594,313* |

---

[13] Because the State did not properly lay a foundation for Mr. Vaclavek to testify as an expert, the Court will only consider his testimony and opinion as a lay witness. Fed. R. Evid. 602, 701, and 703. Thus, the Exhibits in relation to Mr. Vaclavek's expert opinion were not admitted at trial (State Trial Ex. 1, 2, and 5).

[14] The State provided copies of CHI's income tax returns for 2014, 2016, and 2017. *See* State Trial Ex. 49–51.

[15] State Trial Ex. 3.

Mr. Vaclavek further testified that CHI's assets were on a continual decline as liabilities increased from 2013 to 2016.  Vaclavek testified that this is representative of CHI's inability to meet obligations as they became due.  Table 2 shows CHI's assets and liabilities for the investigative period:[16]

**Table 2**

|  | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|
| **Current Assets** |  |  |  |  |
| Cash | $14,940 | $13,013 | $1,196 | - |
| Accounts Receivable | $323,241 | $412,782 | $303,354 | $181,727 |
| Other Current Assets | $3,021 | $3,521 | - | - |
| **Total Current Assets** | $341,202 | $429,316 | $304,550 | $181,727 |
| **Current Liabilities** |  |  |  |  |
| Accounts Payable | $265,289 | $178,557 | $147,086 | $256,024 |
| Mortgage, Notes, Bonds Payable <1 year | $47,691 | $53,075 | $54,830 | $51,981 |
| Other Current Liabilities | $205,020 | $416,631 | $550,639 | $519,430 |
| Loans from Partners | - | - | - | $1,000 |
| **Total Current Liabilities** | $518,000 | $648,263 | $752,555 | $828,435 |

Mr. Vaclavek further testified that Mr. Fawcett was a tax matters partner for CHI and therefore should have known of the company's financial condition.  Mr. Vaclavek testified that a tax matters partner is an individual appointed to handle taxes with the IRS.  Mr. Vaclavek testified that on at least one of the IRS returns for CHI, Mr. Fawcett was listed as a tax matters partner for the company.

After the State concluded its case, Mr. Fawcett took the stand.

### 4.  Mr. Fawcett's Testimony

Mr. Fawcett testified to his prior experience in the residential construction industry, including his time at Midtown Home Improvements (hereinafter "Midtown").  Mr. Fawcett testified that Midtown is a local, residential construction company offering similar services at CHI.  Upon leaving the company, Mr. Fawcett testified that Midtown had "bad blood" with him.

Mr. Fawcett testified to the daily operations in the sales department at CHI: Mr. Fawcett and the marketing department generated the leads; the CHI sales representatives would then be assigned leads by either the marketing department or Mr. Fawcett; and if a lead was successful, the CHI sales representative provided a report on whether a Residential Construction Agreement was formed.  Mr. Fawcett testified that if an agreement was formed and after the cancellation period, CHI's production

---

[16] State Trial Ex. 4.

department would contact the consumers, purchase the materials for the project, and employ subcontractors.

Mr. Fawcett then testified to the Residential Construction Agreement.  Mr. Fawcett testified that the Residential Construction Agreement used by CHI was a form Missouri contract.  *See* Fawcett Trial Ex. H.  Mr. Fawcett testified that the CHI sales representatives drafted the agreements – not Mr. Fawcett. For any payments received by the Consumers towards the total price (i.e., the down payment), Mr. Fawcett testified that CHI's office manager, at the time Kelly Morrison, was responsible for processing payments along with other financial matters at CHI.  Mr. Fawcett testified that neither the CHI sales representatives nor did the Residential Construction Agreements represent there was a guaranteed timeframe for beginning and completing the Consumers' projects due to many variables, including the weather, supply chain issues, employees, etc.  *See* Fawcett Trial Ex. H ¶ 9.  Mr. Fawcett testified that the Consumers could cancel their Residential Construction Agreements within the allotted three-day window in the agreement.  *Id*. at p. 2.  If the Consumers were to request cancellation after the three-day window, Mr. Fawcett testified that their down payment could go towards another project or be subjected to liquidated damages.  *Id*. at ¶ 10.

Mr. Fawcett testified to the downfall of CHI.  Mr. Fawcett testified that it was typical for CHI's business to slow down between November and February of each year due to the colder weather.  During the slower months, Mr. Fawcett testified that CHI would be more conservative with its spending.  Mr. Fawcett testified that at the end of 2016 CHI was still functioning as a business since its suppliers continued to provide supplies and CHI's employees were still intact.[17] However, the turn came in 2017. Mr. Fawcett testified the decline of CHI was due to the weather, loss of employees, and rumors spread by Midtown on the state of CHI.  Mr. Fawcett testified that by March 2017 the loss of CHI's employees became unbearable however CHI continued to pay suppliers, subcontractors and remaining employees and complete projects.  Fawcett Trial Ex. J.  By the end of March, Mr. Fawcett testified that CHI's office manager placed a note on the company's door with contact information not belonging to Mr. Fawcett.

---

[17] Regarding the suppliers, Mr. Fawcett testified that he was responsible for working with and paying the suppliers. He further testified that CHI's debts at the time were only with its suppliers.

25

Mr. Fawcett testified that by April 2017, he determined CHI was no longer able to solicit business so he focused on completing the pending projects.  At this time, Mr. Fawcett testified that CHI was still paying its suppliers, subcontractors, and remaining employees. Mr. Fawcett testified that he attempted to improve CHI's condition by refinancing his home, asking his sister for money, and connecting with the suppliers who were no longer interested in CHI's business.  Mr. Fawcett testified that by May 2017, he realized CHI was done due to the suppliers no longer wanting to work with CHI, its financial condition, and the bad publicity caused by Midtown.  Mr. Fawcett testified that as far as his compensation, in 2016 he made $75,000.00 however in 2017 he only made $10,000.00 as owner of CHI.  Mr. Fawcett testified that on May 31, 2017, CHI officially closed.

Mr. Fawcett emphasized that he intended to complete all the projects for the Consumers. He further stated that he did not owe the Consumers a refund of their down payments or any payments because it was always his intent to complete their projects.  Regarding the financial condition of CHI, Mr. Fawcett testified that he did not know CHI was insolvent and undercapitalized.  Mr. Fawcett testified that despite having the final say on the financials of CHI he believed the financial condition was typical due to the time of year.   Mr. Fawcett testified that the demise of CHI was primarily due to the loss of its employees.

At the conclusion of the trial, the Court took the matter under submission.  The Court rules on the matter below.

## JURISDICTION

This Court has jurisdiction over the parties and subject matter of this proceeding under 28 U.S.C. §§ 157 and 1334 (2021).  This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) (2021).  Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409(a) (2021).

## CONCLUSIONS OF LAW

The State requests this Court liquidate its monetary claims against Mr. Fawcett under the MMPA and declare the corresponding debts nondischargeable under 11 U.S.C. §§ 523(a)(2)(A) and (a)(7). Thus, this Court is tasked to (1) determine whether Mr. Fawcett violated the MMPA as to each consumer and, if so, determine the monetary judgment owed by Mr. Fawcett under the MMPA and (2) determine if

the MMPA monetary judgment is nondischargeable under § 523(a)(2)(A) and if the resulting fine and

penalty are nondischargeable under section 523(a)(7).

## I.    The Missouri Merchandising Practices Act

The MMPA provides a basis for a consumer to bring forth claims against businesses for improper

practices:[18]

> The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce or the solicitation of any funds for any charitable purpose . . . in or from the state of Missouri, is declared to be an unlawful practice.

Mo. Rev. Stat. § 407.020.1.

The MMPA also allots for consumers as a class to present their actions together:

> Persons entitled to bring an action pursuant to subsection 1 of this section may, if the unlawful method, act or practice has caused similar injury to numerous other persons, institute an action as representative or representatives of a class against one or more defendants as representatives of a class, and the petition shall allege such facts as will show that these persons or the named defendants specifically named and served with process have been fairly chosen and adequately and fairly represent the whole class, to recover damages as provided for in subsection 1 of this section.

Mo. Rev. Stat. § 407.025.5.

"The MMPA provides a private right of action to any person who sustains ascertainable loss in

connection with the purchase or lease of personal, family, or household merchandise as a result of

practices the MMPA declares unlawful."  *Tucker v. Gen. Motors LLC*, 58 F.4th 392, 396 (8th Cir. 2023)

(citing Mo. Rev. Stat. § 407.025(1)).   The MMPA was "designed to regulate the marketplace to the

advantage of those traditionally thought to have unequal bargaining power . . . [and] those who may fall

---

[18] As the Eighth Circuit noted, the MMPA protects Missourians from improper practices in a variety of businesses: charitable solicitations, Mo. Rev. Stat. §§ 407.450-.478, time-shares, *id.* §§ 407.600-.630, home solicitations, *id.* §§ 407.700-.720, rent-to-own agreements, *id.* §§ 407.660-.665, buyers' clubs, *id.* §§ 407.670-.679, automobile subleasing and renting, *id.* §§ 407.730-.748, and health clubs, *id.* § 407.325-.340. *Elec. & Magneto Serv. Co. Inc. v. AMBAC Int'l Corp.*, 941 F.2d 660, 662 (8th Cir. 1991), *abrogated on other grounds by Baxter Int'l, Inc. v. Morris*, 976 F.2d 1189 (8th Cir. 1992).

victim to unfair business practices."[19]  *Elec. & Magneto Serv. Co. Inc. v. AMBAC Int'l Corp.*, 941 F.2d 660, 662 (8th Cir. 1991), *abrogated on other grounds by Baxter Int'l, Inc. v. Morris*, 976 F.2d 1189 (8th Cir. 1992).

For the State's MMPA claim to prevail, the State must demonstrate that each consumer "(1) purchased [a service] from [CHI]; (2) for personal, family or household purposes; and (3) suffered an ascertainable loss of money or property; (4) as a result of an act declared unlawful under the [MMPA]." *Tucker v. Gen Motors LLC*, 58 F.4th 392, 396–397 (8th Cir. 2022) (quoting *Vitello v. Natrol, LLC*, 50 F.4th 689, 693 (8th Cir. 2022)); *Schulte v. Conopco, Inc.*, 997 F.3d 823, 825–826 (8th Cir. 2021) (quoting *Toben v. Bridgestone Retail Operations*, LLC, 751 F.3d 888).  The State claims Mr. Fawcett violated the MMPA by using "false promises, deception, and unfair practices in connection with the sale of residential construction services."  *See* Doc. 53 p. 7.

It is undisputed that the first two elements are satisfied.  CHI contacted the Consumers to offer residential construction services satisfying the first element.  *See* Doc. 46.  The Consumers paid a down payment and entered into Residential Construction Agreements for the residential construction services satisfying the second element.  *Id.*  However, the third and fourth elements are still in dispute. The State argues the Consumers suffered an ascertainable loss due to Mr. Fawcett's unlawful actions under the MMPA.  However, Mr. Fawcett argues that the State cannot meet its burden of proving Mr. Fawcett committed any unlawful action under the MMPA. Thus, the Court must determine whether Mr. Fawcett's actions were unlawful under § 407.020 and, if so, whether the Consumers' loss of funds is ascertainable.

### A.  Unlawful Actions

The MMPA requires a showing of one of the unlawful actions listed in section 407.020.1.  *See* Mo. Rev. Stat. § 407.020.1.  "The legislature intended section 407.020 to 'supplement the definitions of common law fraud . . . to preserve fundamental honesty, fair play and right dealings in public transactions.'"  *Sevenans v. Leonard (In re Leonard)*, 2010 Bankr. LEXIS 3670, at *6 (Bankr. W.D. Mo.

---

[19] *See* William Webster, Richard Thurman, & Mike Finkelstein, *Combatting Consumer Fraud in Missouri: The Development of Missouri's Merchandising Practices Act*, 52 Mo. L. Rev. 365, 369 (1987) (The legislative intent of the MMPA is "to protect consumers in the marketplace not only from actively commit[ing] fraud (i.e., misrepresentation, deception, or false promise) but also from passive fraud (i.e., concealment or omissions of material facts)").

Oct. 22, 2010) (quoting *Huch v. Charter Commc'n, Inc.*, 290 S.W.3d 721, 724 (Mo. 2009)). "[T]he MMPA supplements the definitions of common law fraud, eliminating the need to prove an intent to defraud or reliance." *In re Leonard*, 2010 Bankr. LEXIS 3670, at *7 (quoting *Schuchmann v. Air Servs. Heating & Air Conditioning, Inc.*, 199 S.W.3d 228, 233 (Mo. Ct. App. 2006)).

The MMPA contains a few defined terms[20] however an intelligible principle is included in the statute affording the attorney general authority to both promulgate the MMPA rules and define terms. *See* Mo. Rev. Stat. §§ 407.020 and 407.145.[21] For the undefined terms, this Court will consider the plain and ordinary meaning as defined by the Missouri courts. *Tucker v. Gen Motors LLC*, 58 F.4th 392, 396 (8th Cir. 2022) ("[W]e apply Missouri's rules of statutory construction in interpreting the MMPA") (citing *Behlmann v. Century Sur. Co.*, 794 F.3d 960, 963 (8th Cir. 2015) ("Interpreting state statutes, this court applies that state's rules of statutory construction.")) (citations omitted). The unlawful actions the State argues Mr. Fawcett used in his dealings with the Consumers were false promises, deception, and unfair practices.

A caveat to § 407.020 is that the unlawful act must have occurred in connection with the sale of the residential services. Missouri courts adopt *Conway v. CitiMortgage, Inc.*'s definition of "in connection with." *Conway v. CitiMortgage, Inc.*, 438 S.W.3d 410, 414 (Mo. banc 2014); *State v. Kowalski*, 587 S.W.3d 709, 715 (Mo. Ct. App. 2019); *Jackson v. Barton*, 548 S.W.3d 263, 270 (Mo. banc 2018); *see Schulte v. Conopco, Inc.*, 997 F.3d 823, 826 (8th Cir. 2021); *see also Johnson v. Gilead Scis., Inc.*, 563 F.Supp.3d 981, 987 (E.D. Mo. 2021). The *Conway* court defined "in connection with" to mean that the MMPA "prohibits the use of the enumerated deceptive practices if there is a relationship between the sale of merchandise and the alleged unlawful action." *Conway*, 438 S.W.3d at 414. The unlawful action however can occur at anytime before, during, or after the sale so long as there is a connection between the two.[22] *Jackson*, 548 S.W.3d at 270 (quoting *Conway*, 438 S.W.2d at 415). For each of the unlawful

---

[20] For instance, "advertisement," "documentary material," "examination of documentary material," "merchandise," "person," "sale," and "trade" or "commerce" are defined. *See* Mo. Rev. Stat. § 407.010.

[21] Section 407.145 specifically states that "[t]he attorney general shall have the authority to promulgate, in accordance with the provisions of chapter 536, all rules necessary to the administration and enforcement of the provisions of this chapter."

[22] Though the State must show a nexus between the sale and the unlawful action, the State is not required to show that the Consumers relied on the unlawful action. *Johnson v. Gilead Sciences, Inc.*, 563 F.Supp.3d 981, 989-990

acts alleged by the State, the Court will simultaneously determine whether there is a relationship between the sale of the residential services and the unlawful act.

Under the Missouri Code of State Regulations, a "false promise" is "any statement or representation which is false or misleading as to the maker's intention or ability to perform a promise, or likelihood the promise will be performed." Mo. Code Regs. Ann. tit. 15, § 60-9.060.1. "Reliance and injury are not elements of false promise as used in section 407.020.1, RSMo." *Id*. at § 60-9.060.2. "Deception is any method, act, use, practice, advertisement or solicitation that has the tendency or capacity to mislead, deceive or cheat, or that tends to create a false impression." *Id*. at § 60-9.020.1. However, there is no requirement to demonstrate a consumer's culpable mental state to prove deception. *Id*. at § 60-9.020.2.

An "unfair practice" includes two components: (1) the practice must either a) offend public policy established by federal or state law or statute or b) be "unethical, oppressive or unscrupulous" and (2) the practice must "[p]resent[] a risk of, or cause, substantial injury to consumers." Mo. Code Regs. Ann. tit. 15, § 60-8.020.1; *Toben v. Bridgestone Retail Operations, LLC*, 751 F.3d 888, 896 (8th Cir. 2014) (citations omitted). "Proof of deception, fraud, or misrepresentation is not required to prove unfair practices." Mo. Code Regs. Ann. tit. 15, § 60-8.020.2. "It is an unfair practice for any person in connection with the sale of merchandise to unilaterally breach unambiguous provisions of consumer contracts." Mo. Code Regs. Ann. tit. 15, § 60-8.070.1. "The Missouri Supreme Court has explained that the plain meaning of 'unfair practice' is 'unrestricted, all-encompassing and exceedingly broad' and covers 'every practice imaginable and every unfairness to whatever degree.'" *Bradley v. Hertz Corp*., 2019 WL 3975177, at *3 (S.D. Ill. Aug. 22, 2019) (quoting *Conway*, 438 S.W.3d at 416).

---

(E.D. Mo. 2021) (citing Mo. Rev. Stat. § 407.025); *Huch v. Charter Commun., Inc.*, 290 S.W.3d 721, 724 (Mo. banc. 2009) ("It is not necessary in order to establish 'unlawful practice' to prove the elements of common law fraud."); *Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758, 774 (Mo. banc 2007) ("[a] consumer's reliance on an unlawful practice is not required under the MMPA."); *Plubell v. Merck & Co.*, 289 S.W.3d 707, 714 (Mo. Ct. App. 2009) ("[Missouri] case law and the governing regulations make clear that the consumer's reliance on an unlawful practice is not required under the MMPA."); *Huffman v. Credit Union of Texas*, 758 F.3d 963, 968 (8th Cir. 2014) ("Unlike common law fraud claims, to recover under the MMPA, a consumer-purchaser need not prove that the seller had actual knowledge of an undisclosed material fact, reliance by the plaintiff, or the seller's intent to induce reliance[.]"). Essentially, the unlawful act itself must have caused the consumer to suffer a loss. *Bradley v. Hertz Corp.*, 2019 WL 3975177, at *4 (S.D. Ill. Aug. 22, 2019).

The State argues that Mr. Fawcett is liable to the Consumers for deceiving or making false promises to the Consumers with his representations.  The State also argues that under Mr. Fawcett's control CHI's failure to perform the contracted residential construction services for the Consumers was a unilateral breach amounting to an unfair practice under the MMPA.  The State posits that Mr. Fawcett as CHI's owner and operator retained control over CHI's employees.  At trial, two of CHI's former employees testified that the sales representatives would obtain most if not all their leads from Mr. Fawcett through a voicemail system.[23]  The CHI employees were responsible for contacting the consumers and informing them that CHI would perform residential construction services in exchange for their upfront payment.  The State argues that at the time of these contacts CHI was undercapitalized and insolvent.  Through testimony by Mr. Vaclavek and evidence of Mr. Fawcett's authority over the CHI Bank Accounts, the State posits that Mr. Fawcett knew or should have known of CHI's financial condition because he was in control and had sole authorization of CHI's accounts and was a tax matters partner for CHI.  Further, the State posits that there is a connection between Mr. Fawcett's committing of these unlawful acts by and through CHI's employees and the sale of the residential construction services to the Consumers.  As the State suggests, the Consumers would not have furnished the down payment if not for the representations of the CHI employees.  Thus, the statements made by the employees that CHI would perform the residential construction services were deceptive, amounted to false promises and were the result of an unfair practice.

Mr. Fawcett argues he did not deceive, make false promises, or otherwise engage in an unfair practice in relation to any of the Consumers.  In the trial brief and at trial, Mr. Fawcett posits that he did not intend to mislead the Consumers but believed the truth of the statements and representations made through the CHI employees.  Mr. Fawcett testified that he did not know of CHI's financial condition and believed the finances were due to rumors presented to the public by CHI's competition (i.e. Midtown) and

---

[23] The previous employees, Mr. Johnson and Mr. Harrison who were both former sales representatives at CHI, specifically stated that every night Mr. Fawcett would leave the sales representatives voicemails of consumers to contact the following day. The sales representatives were responsible for listening to these voicemails and following through with the leads.

the usual decline in income for CHI due to the winter months.  Mr. Fawcett further stated that he acted in a manner consistent with his belief that CHI would complete the Consumers' projects.

Because the MMPA was specifically implemented to protect consumers by any means necessary, there is a lower burden the State must show to prove Mr. Fawcett committed an unlawful action.  Thus, this Court finds that the State has met its burden in showing Mr. Fawcett committed the unlawful actions of deception, false promise, and unfair practice under the MMPA.  Mr. Fawcett should have known of CHI's financial demise through his position as owner of CHI, control and sole authorization over the CHI Bank Accounts, and IRS filing as CHI's tax matters partner.  Even if Mr. Fawcett wanted to complete every one of the Consumers' projects, the State presented enough evidence to show that Mr. Fawcett at the very least should have known of CHI's financial condition.  Further, Mr. Fawcett's control over the leads to CHI's sales representatives is enough to show Mr. Fawcett's liability to the Consumers.  Coupled with Mr. Fawcett's knowledge of CHI's financial condition, the State has shown a connection between the Consumers putting forth funds in response to the CHI employee's representations.

As CHI's owner, Mr. Fawcett retained control over CHI's employees, including the sales representatives who received their leads and direction from Mr. Fawcett regarding sales, and is therefore liable under the doctrine of respondeat superior.[24]  The CHI employees' representations to the Consumers induced them to enter into the residential construction services contract and provide down payments.  Thus, Mr. Fawcett engaged in unlawful actions.  There is a nexus between Mr. Fawcett's unlawful actions and the Consumers' loss of funds.  Therefore, the State has proven that Mr. Fawcett violated the MMPA.

**B.  Ascertainable Loss**

Next, the State must prove each consumer suffered an ascertainable loss.  Under the MMPA, there are three requirements each consumer must individually establish: (1) they acted as a reasonable consumer under the circumstances; (2) the unlawful act would cause a reasonable person to enter into the agreement; and (3) damages with sufficiently definitive and objective evidence to allow calculation of

---

[24] Further under the doctrine of respondeat superior, Mr. Fawcett as the employer is liable for the employees' actions committed during and in relation to their position at CHI.

the loss with a reasonable degree of certainty.  Mo. Rev. Stat. § 407.025.5.  The first and second prongs are established here.  A "reasonable consumer" is one where an objective person similarly situated would act in the same or similar way under the circumstances.[25]  It is undisputed that the Consumers satisfy the first and second requirements.  Given CHI's history and Mr. Fawcett's unlawful actions found in subsection A., it is surmisable that a person in the Consumers' position would enter into an agreement for residential services and submit a down payment for the service.  Thus, the third prong is primarily at issue here.

The State seeks restitution for each Consumers' loss of down payments.  In Missouri, courts use the "benefit of the bargain" rule to determine whether an ascertainable loss occurred under the statute.  *Vitello v. Natrol, LLC*, 50 F.4th 689, 693 (8th Cir. 2022); *Sunset Pools of St. Louis, Inc. v. Schaefer*, 869 S.W.2d 883, 886 (Mo. App. 1994) (The Missouri state court looked to the purpose of the MMPA, which is to "supplement the definitions of common fraud" in preserving consumer transactions, in determining that the benefit of the bargain rule must be used to determine actual damages in MMPA claims.).  The benefit of the bargain rule is a common law remedy that "awards a prevailing party the difference between the value of the product as represented and the actual value of the product as received."  *Vitello*, 50 F.4th at 693 (quoting *Thompson v. Allegran USA, Inc.*, 993 F.Supp. 2d 1007, 1012 (E.D. Mo. 2014)).

The Court finds that the State has demonstrated that the Consumers in general suffered a loss.  The Consumers and CHI entered into an agreement for various residential construction services.  The Consumers paid a down payment in exchange for CHI's performance under their respective Residential Construction Agreements.  For example, most of the Consumers entered into a Residential Construction Agreement with CHI for a residential project.  The Residential Construction Agreement included the down

---

[25] As the Missouri Eastern District Court states in *Bell v. Annie's, Inc.* –

> The Missouri Approved Jury Instructions accounts for the MMPA's reasonableness requirement by adding that a jury must find that a plaintiff was acting "in the exercise of ordinary care." Mo. Approved Jury Instr. (Civil) 39.02 (8th ed.). And it defines "ordinary care" as "that degree of care that an ordinarily careful person would use under the same or similar circumstances." *Id*. at 11.05. Thus, the Court will analyze the statute through that standard. *See Syn, Inc. v. Beebe*, 200 S.W.3d 122, 128-29 (Mo. Ct. App. 2006) ("The law is well-settled that where an MAI instruction applies to the case, the use of such instruction is mandatory.").

*Bell v. Annie's, Inc.*, 2023 U.S. Dist. LEXIS 87664, at *7 nt.5 (Mo. E.D. May 18, 2023).

payment amount and total price of the project.   The Consumers paid the down payment and were provided a start date or, at the very least, was promised performance.  As the initial start date arrived, the Consumers contacted CHI and a CHI representative provided them with another start date.  The second start date arrived, the Consumers contacted CHI and/or Mr. Fawcett for an update, and the start date was changed again.  This cycle continued until CHI and/or Mr. Fawcett stopped communicating.  For most if not all of the Consumers, the start date never arrived and performance under their Residential Construction Agreements never began.  Thus, the Consumers should receive the benefit of their bargain for CHI's failure to perform under the terms of their individual Residential Construction Agreements.

Despite showing a general loss occurred, the statute calls for the loss to be ascertainable.  The State alleges that the total amount owed to the Consumers in restitution is $156,019.81.  The State includes all the Consumers' transactions regardless of the evidence (or lack thereof) provided.  The Court finds this amount inaccurate.  The Consumers can be broken down into two groups: those with proof of loss and those without proof of loss.  For the Consumers with proof, the State provides some form of proof through a combination of testimony, payment and/or receipt, as stipulated to by the parties or the Residential Construction Agreement itself.  These Consumers are Mr. Salley, Mr. Ikemeier, Ms. Baughman, Ms. Templeton, the Cusicks, the Wadsworths, the Robbins, the Gatewoods, Ms. Madras, the Van Horns, Ms. Velker, Mr. Weeks, Mr. Hafner, Mr. Speicher, the Bradys, Ms. Hardin, Ms. Blank, the Edingers, Mr. Heiser, Mr. Cross, Ms. Warren, Ms. Motts,[26] Ms. Triplett, Mr. Stone, Mr. Willard, Mr. Klein, and Ms. Busch (hereinafter, collectively the "Proven Loss Consumers").  The Consumers without proof in that the only offer was the Complaint are Mr. Fulmer, Mr. Wray, Ms. Hayes, Ms. Cahalin, and Ms. Simon (hereinafter, collectively the "Non Proven Loss Consumers").  Because the loss must be ascertainable, the Court will only include the amounts owed to the Proven Loss Consumers and exclude those of the Non Proven Loss Consumers.  The total amount of restitution owed to the Proven Loss Consumers is $142,752.33.  Therefore, the Court finds the Consumers suffered an ascertainable loss in the total amount of $142,752.33.

---

[26] Despite only offering Ms. Motts' testimony and Residential Construction Agreement, the Court includes Ms. Motts' within the proven loss individuals because Mr. Fawcett did not deny or object to the transaction at trial.

34

### C.  Additional Relief

The State seeks additional relief afforded under the MMPA: $15,601.98 as a credit under Mo. Rev. Stat. § 407.140.3; $32,000.00 as a penalty for each violation under Mo. Rev. Stat. § 407.100.6; and pre-petition costs to investigate and prosecute under Mo. Rev. Stat. § 407.130.  The Court is permitted to award injunction or other equitable relief along with reasonable attorney's fees.   Mo. Rev. Stat. § 407.025.5.  Because the Court awarded the State restitution for the Proven Loss Consumers, the MMPA requires a credit in the amount of ten percent of the restitution award.  Mo. Rev. Stat. § 407.140.3. Here, that amount is $14,275.23.  For the remaining relief requested, in keeping with the purpose of the MMPA, this Court will award the relief as modified to account for only the Proven Loss Consumers: $27,000.00 as a civil penalty under Mo. Rev. Stat. § 407.100.6 and costs including court costs, cost of investigation and prosecution under Mo. Rev. Stat. § 407.130.[27]

There are pertinent differences between § 523(a)(2)(A) and § 407.020.   Under section 523(a)(2)(A), the State is required to show Mr. Fawcett's intent and the Consumers' reliance – this is not the case under section 407.020.[28]  Also, the requirements for fraud are more rigid than § 407.020 because of the Bankruptcy Code's balancing of interests between the debtor and creditor.  Thus, despite the MMPA's sole purpose of protecting consumers, the Court now must determine whether the State's claims survive under the more stringent requirements of section 523(a)(2)(A).

### II.   <u>11 U.S.C. § 523(a)(2)(A)</u>

Under Section 523(a)(2)(A), a debtor is not entitled to discharge "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial

---

[27] The State did not include its investigation and prosecution costs.  Therefore, the Court will not award the State its costs to investigate and prosecute.

[28] Despite this Court's MMPA determination against Mr. Fawcett, a finding of liability under the MMPA does not equate to or amount to a presumable assumption of nondischargeability under Section 523(a)(2)(A).  *See In re Leonard*, 2010 Bankr. LEXIS 3670, at *9 (Bankr. W.D. Mo. Oct. 22, 2010) ("[A] finding of liability under the MMPA does not necessarily equate to a finding that a debt is nondischargeable under § 523(a)(2)(A)."); *see also Huch v. Charter Commc'n, Inc.*, 290 S.W.3d 721, 724 (Mo. 2009) ("The legislature intended section 407.020 to 'supplement the definitions of common law fraud in an attempt to preserve fundamental honesty, fair play and right dealings in public transactions.'"); *see also Field v. Mans*, 516 U.S. 59, 76, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) (Unlike section 407.020, the United States Supreme Court determined Section 523(a)(2)(A) encompassed common law fraud.)

condition." 11 U.S.C. § 523(a)(2)(A) (2021). The exceptions to discharge under § 523(a) are strictly and narrowly construed against the creditor and liberally as to the debtor. *In re Sulier*, 541 B.R. 867, 877 (Bankr. D. Minn. 2015) (citing *In re Thompson*, 686 F.3d 940, 944 (8th Cir. 2012) (citing *In re Nail*, 680 F.3d 1036, 1038 (8th Cir.2012)). To prevail under Section 523(a)(2)(A), the State must prove the following by a preponderance of the evidence[29] (*Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 655, 112 L.Ed.2d 755 (1991)):

> 1. The debtor made a representation;
> 2. The debtor knew that the representation was false at the time it was made;
> 3. The representation was deliberately made for the purpose of deceiving the creditor;
> 4. The creditor justifiably relied on the representation; [and]
> 5. The creditor sustained alleged loss as a proximate result of the representation having been made.

*Matter of Van Horne*, 823 F.2d 1285, 1287 (8th Cir. 1987), *abrogated on other grounds*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755); *Keefe Law Firm v. Days*, 540 B.R. 423, 428 (Bankr. E.D. Mo. 2015); *Field v. Mans*, 516 U.S. 59, 73-74, 116 S. Ct. 437, 443, 133 L. Ed. 2d 351 (1995). The State argues that Mr. Fawcett violated § 523(a)(2)(A) by using false pretenses, false representations, *and* fraud by procuring the Consumers' upfront deposits and failing to either complete the work or refund them.

The terms "false pretense," "false representation," and "actual fraud" are common law terms. *Field v. Mans*, 516 U.S. 59, 69, 116 S.Ct. 437, 443, 133 L. Ed. 2d 351 (1995); *see Durland v. United States,* 161 U.S. 306, 312, 16 S.Ct. 508, 510, 40 L.Ed. 709 (1896); *James–Dickinson Farm Mortgage Co. v. Harry,* 273 U.S. 119, 121, 47 S.Ct. 308, 309, 71 L.Ed. 569 (1927). "It is . . . well established that '[w]here Congress uses terms that have accumulated settled meaning under . . . the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms.'" *Field v. Mans*, 516 U.S. at 69 (quoting *Community for Creative Non–Violence v. Reid*, 490 U.S. 730, 739, 109 S.Ct. 2166, 2172, 104 L.Ed.2d 811 (1989) (quoting *NLRB v. Amax Coal Co.,* 453 U.S. 322, 329, 101 S.Ct. 2789, 2794, 69 L.Ed.2d 672 (1981)); *see also Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 322, 112 S.Ct. 1344, 1347, 117 L.Ed.2d 581 (1992).

---

[29] Meaning, a fact's existence is more probable than not. *In re Winship*, 397 U.S. 358, 371–72, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

"The determination of whether a requisite element of a claim under § 523(a)(2) is present is a factual finding." *Reuter v. Cutcliff (In re Reuter)*, 443 B.R. 427, 433 (B.A.P. 8th Cir. 2011) (citing *Lindau v. Nelson (In re Nelson)*, 357 B.R. 508, 512 (B.A.P. 8th Cir. 2006)); *Merchants Nat'l Bank of Winona v. Moen (In re Moen)*, 238 B.R. 785, 790 (B.A.P. 8th Cir. 1999).

A false pretense is an "implied misrepresentation or conduct intended to create and foster a false impression." *In re Moen*, 238 B.R. at 790 (quoting *In re Guy*, 101 B.R. 961, 978 (Bankr. N.D. Ind. 1988)). "[W]hen the circumstances imply a particular set of facts, and one party knows the facts to be otherwise, that party may have a duty to correct what would otherwise be a false impression." *In re Moen*, 238 B.R. at 791 (quoting *In re Malcolm*, 145 B.R. 259, 263 (Bankr. N.D. Ill. 1992) (citing *In re Dunston*, 117 B.R. 632, 639-641 (Bankr. D. Colo. 1990)).

A misrepresentation can include "words spoken or written . . .[and] other conduct that amounts to an assertion not in accordance with the truth." *In re Moen*, 238 B.R. 791 (quoting *In re Melancon*, 223 B.R. 300, 308-309, (Bankr. M.D. La. 1998) (internal citations omitted)). Silence by the debtor on a material fact can indicate a false representation.[30] *In re Moen*, 238 B.R. 785, 791 (B.A.P. 8th Cir. 1999); *Caspers v. Van Horne (Matter of Van Horne)*, 823 F.2d 1285, 1288 (8th Cir. 1987), abrogated on other grounds *Grogan v. Garner*, 498 U.S. 279, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991); *In re Cowles, 578 B.R. 108, 139 (Bankr. D. Mass. 2017)*. "For a representation to rise to the level of fraud for purposes of § 523(a)(2)(A), it must be false when made." *In re Days*, 540 B.R. 423, 428 (Bankr. E.D. Mo. 2015) (quoting *In re Doody*, 504 B.R. 527, 538 (Bankr. D. Minn. 2014)).

The term "actual fraud" is broken into two parts: actual and fraud. "Actual" is "any fraud that 'involv[es] moral turpitude or intentional wrong.'" *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 356, 360, 136 S. Ct. 1581, 1586, 194 L. Ed. 2d 655 (2016) (quoting *Neal v. Clark,* 95 U.S. 704, 709, 24 L.Ed. 586 (1878)). "[A]nything that counts as 'fraud' and is done with wrongful intent is 'actual fraud.'" *Husky Int'l*

---

[30] However, the debtor is not obligated to provide too much information but enough for a reasonable creditor to make a decision. *See Matter of Van Horne*, 823 F.2d at 1288 ("While it is certainly not practicable to require the debtor to 'bare his soul' before the creditor, the creditor has the right to know those facts touching upon the essence of the transaction.").

*Elecs., Inc.*, 578 U.S. at 360.  The Eighth Circuit defines "actual fraud" as "any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another – something said, done or omitted with the design of perpetrating what is known to be a cheat or deception."  *In re Moen*, 238 B.R. at 790 (quoting *RecoverEdge L. P. v. Pentecost*, 44 F.3d 1284, 1293 (5th Cir. 1995)).

The State presents similar if not the same facts as evidence of Mr. Fawcett's false pretense, false representation, and actual fraud:

> a.  CHI was insolvent and undercapitalized as its current liabilities exceeded its current assets;
> b.  Mr. Fawcett was aware and the sole person who knew of CHI's financial condition;
> c.  Mr. Fawcett was the sole administrator over the CHI Bank Accounts;
> d.  Mr. Fawcett was listed as a tax matters partner on CHI's tax returns; and
> e.  Mr. Fawcett paid CHI's debts using the Consumers' deposits.

Plaintiff's Trial Brief p. 8-9.

Essentially, the State argues that through Mr. Fawcett's control, CHI representatives represented to the Consumers that CHI would complete the Consumers' projects in exchange for the Consumers' upfront down payments.  The CHI representatives' statements induced the Consumers to enter into agreements with CHI and pay the down payments despite CHI not intending to complete the projects. Thus, because of the vast similarities between the terms (i.e., false pretense, false representation, and actual fraud), the Court will focus on whether the State has proven the elements of § 523(a)(2)(A) by a preponderance of the evidence as provided below.[31]

### A.  Representation by Debtor

The first factor the State must prove is whether a representation was made to the Consumers by Mr. Fawcett.  A "representation" includes statements, conduct, and actions by the debtor that amounts to an assertion.  *U.S. v. Evans (In re Evans)*, 584 B.R. 20, 26 (Bankr. E.D. Mo. 2018) (citing *In re Sullier*,

---

[31] As the *Moen* court notes, "[e]ven though it may be obvious, based upon the particular facts of a given case, that the debtor has committed fraud [under § 523(a)(2)(A)], it is not always possible to neatly categorize the conduct that amounts to fraud as being either 'actual fraud,' a 'false representation, or a 'false pretense.'" *In re Moen*, 238 B.R. 785, 794 (B.A.P. 8th Cir. 1999).

541 B.R. 867, 878 (Bankr. D. Minn. 2015) (quoting *Moen*, 238 B.R. at 791)).  The State argues that Mr. Fawcett represented to the Consumers that CHI would begin and complete the Consumers' projects.  Mr. Fawcett does not dispute that a representation to begin and complete the Consumers' projects occurred.

The Court concludes that Mr. Fawcett through himself and CHI represented to the Consumers that CHI would begin and complete their projects.  The Residential Construction Agreements themselves provide the first instance of this representation in that an agreement to complete the Consumers' projects formed between the Consumers and CHI.  The second indication is the contacts between the Consumers, CHI, and Mr. Fawcett.  When the Consumers contacted CHI inquiring about the status of their projects, they were consistently told generally that CHI would complete their project.  Further, when Mr. Fawcett was contacted directly, he ensured the Consumers that CHI intended to complete their projects – even up until a month before the company's demise.  The State proved these representations through the testifying Consumers accounts and various exhibits showing communication between Mr. Fawcett and the Consumers. Mr. Fawcett and the CHI representatives continuously told the Consumers that their projects would begin and be completed.  These representations were made up until CHI closed its doors.  Therefore, the State has met its burden of proving the first factor.

### B. Debtor's Knowledge of the Representation

The second factor the State must prove is whether Mr. Fawcett knew of the falsity of the representation.  If the debtor should have known of the falsity of the representation, this is enough to satisfy the knowledge requirement.  *In re Shawver*, 2020 WL 1486780, at *7 (Bankr. E.D. Mo. Mar. 23, 2020), *aff'd*, 2021 WL 4504417 (E.D. Mo. Sept. 30, 2021) (citing *In re Moen*, 238 B.R. at 791 (quoting *In re Duggan*, 169 B.R. 318, 324 (Bankr. E.D.N.Y. 1994) ("A false representation made under circumstances where a debtor should have known of the falsity is one made with reckless disregard for the truth, and this satisfies the knowledge requirement."); *see In re Sulier*, 541 B.R. at 879.   In determining whether the debtor knew the representation was false, the debtor's knowledge and experience must be considered.  *Id*.  "[A] material promise to perform in the future that is made without the intent to perform and with the intention of defrauding the creditor, constitutes actionable fraud under § 523(a)(2)(A)."  *In re Sulier*, 541 B.R. at 879 (citing *In re Freier*, 604 F.3d at 588; *Gadtke v. Bren (In re*

39

*Bren*), 284 B.R. 681, 690 (Bankr. D. Minn. 2002)).  The State argues that Mr. Fawcett knew that CHI was insolvent and undercapitalized prior to CHI's employees soliciting residential construction services from the Consumers.  The Court agrees.

Because of his position as owner and tax matters partner, Mr. Fawcett had access to information regarding the financial well-being of CHI.  Mr. Fawcett maintained exclusive control over the Commerce Account and PNC Account.  With control over the CHI Bank Accounts, Mr. Fawcett was granted access to CHI's deposits and withdrawals and could note the company's financial condition monthly through monthly statements provided by Commerce Bank and PNC Bank.

Being the sole owner and manager of CHI, the Court is unconvinced that Mr. Fawcett did not know the magnitude of CHI's financial state.  The Court considers Mr. Vaclavek's testimony at trial regarding CHI's financial condition.[32]  As Table 1 depicts, CHI faced undercapitalization and insolvency from 2013 until the company's end in 2017.   *See* supra p. 23.  Further, since 2013 CHI's liabilities greatly exceeded its assets: $341,202.00 in total assets and $518,000.00 in total liabilities in 2013; $429,316.00 in total assets and $648,263.00 in liabilities in 2014; $304,550.00 in assets and $752,555.00 in liabilities in 2015; and $181,727.00 in assets and $828,435.00 in liabilities in 2016.  *See* Table 2, supra p. 24.

Mr. Fawcett's testimony that CHI's business typically slowed down in the colder months and that the rumors started by Midtown tainted the company are without merit.  Considering Tables 1 and 2 presented by Mr. Vaclavek at trial along with the tax returns submitted by the State, CHI's financial state did not come about quickly one year prior to its end but was a recurring problem since 2013.  Also, CHI's financial condition with its suppliers began to whither in 2016 showing another indication of the company's financial state.  Mr. Eilerman testified that the suppliers, who at one point accepted payment for project materials later, began requesting upfront payment prior to him leaving CHI in 2016.  Further, CHI's previous employees testified to experiencing benefit and pay cuts in 2016 indicating that Mr. Fawcett in fact did know the company's financial state.  There were several indications of CHI's poor financial condition that Mr. Fawcett should have recognized sooner rather than later.

---

[32] As the Court previously stated, Mr. Vaclavek's testimony will not be given expert weight.  *See* supra n. 9. However, the Court gives weight to the tables as they are derived from CHI's tax returns.

The Court concludes that Mr. Fawcett should have known about CHI's insolvency and undercapitalization prior to 2017 given Mr. Fawcett's position as owner and tax matters partner along with CHI's poor financial condition since 2013. Because of Mr. Fawcett's knowledge of CHI's financial condition along with his position in the company, Mr. Fawcett should have known the representations to begin and complete the Consumers' projects were false. Therefore, the State has met its burden in proving the second factor.

### C.  Representation Intended to Deceive Creditor

The third factor the State must show is that Mr. Fawcett intended to deceive the Consumers. Intent is inferred when the debtor makes a false representation and should have known the statement would induce the creditor. *Reuter v. Cutcliff (In re Reuter)*, 443 B.R. 427, 435 (B.A.P. 8th Cir. 2011) (citing *In re Duggan*, 169 B.R. at 324). Thus, the creditor is only required to show that the debtor intended to "induce the creditor to rely and act on the misrepresentations." *In re Moen*, 238 B.R. at 791 (quoting *In re Swan*, 156 B.R. 618, 623 n. 6 (Bankr. D. Minn. 1993) (citing *In re Hunter*, 771 F.2d 1126, 1129 (8th Cir. 1985)). The creditor can show the debtor's intent directly or it can be inferred through circumstantial evidence.[33] *In re Reuter*, 443 B.R. at 435 (citing *In re Van Horne*, 823 F.2d at 1287); *see In re Moen*, 238 B.R. at 791. Here, the State proves that Mr. Fawcett intended to deceive the Consumers to enter into the Residential Construction Agreements and to pay substantial down payments without the intention to begin or even complete their projects.

As previously discussed, CHI's financial condition was not a sudden occurrence but a progressive fact that began prior to 2017. CHI's liabilities greatly exceeded its assets, and the company was considered undercapitalized and insolvent beginning in 2013. Mr. Fawcett, at the very least, should have known about CHI's progressively failing financial condition a lot sooner than 2017. Despite the reality of CHI's finances, Mr. Fawcett continued soliciting business up to and until March 2017 – two months prior to CHI closing its doors.

---

[33] As this Court previously stated, a creditor is not required to show "malevolence or personal ill-will" by the debtor. *In re Evans*, 584 B.R. 20, 27 (Bankr. E.D. Mo. 2018) (citing *In re Swan*, 156 B.R. 618, 623 n. 6 (Bankr. D. Minn. 1993) (citing *In re Hunter*, 771 F.2d 1126, 1129 (8th Cir. 1985)); *see In re Sulier*, 541 B.R. 867, 882 (Bankr. D. Minn. 2015).

Mr. Fawcett knew about the contract provisions in the Residential Construction Agreements, which protected CHI from seemingly having to ever return the Consumers' payments. The Consumers only had three days from the signing of the Residential Construction Agreements to rescind the contract and receive a full refund. *See* Fawcett Trial Ex. H p. 2. The Residential Construction Agreement calls for substantial damages if the Consumers breached and states time is not of the essence. *Id.* at p. 1 ¶¶ 9-10. In Mr. Fawcett's communications with the Consumers, he referred to these provisions whenever the Consumers attempted to rescind even when it was apparent CHI would not perform.

It can be inferred that Mr. Fawcett used the Consumers' down payments towards other projects. From the Commerce Account and PNC Account statements along with the various checks submitted by the State and Mr. Fawcett, CHI through Mr. Fawcett paid its employees and suppliers. However, there was no testimony and the Court cannot garner from the documents themselves as to whether the suppliers paid were for the Consumers' projects. Further, Mr. Fawcett testified that in April 2017 he focused on completing the pending projects but again provides no indication of this.[34] Mr. Fawcett testified to receiving a $30,000.00 loan from a family member to aid in CHI's debts and his own personal debts. The family member sent the loan to Mr. Fawcett's spouse on April 5, 2017. Fawcett Trial Ex. I. The transfer does show a purported attempt to aid in CHI's debts however the Consumers did not receive any of that money. Further, the Consumers transactions occurred in late 2016 and early 2017. There at the very least should have been materials paid and presented to the Consumers, especially those in 2016, to support these intentions.

Despite Mr. Fawcett's verbal intentions, the Court finds that Mr. Fawcett intended to deceive the Consumers under the circumstances. Therefore, the State has met its burden in proving the third factor.

### D. Creditor Justifiably Relied on the Representation

The fourth factor the State must show is that the Consumers justifiably relied on Mr. Fawcett's representations. Justifiable reliance is "the standard applicable to a victim's conduct where, 'under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory

---

[34] The Court received several copies of Mr. Fawcett's and CHI's bank statements and checks from 2017. However, there was no testimony, argument, or additional proof that the checks and withdrawals were for the Consumers' projects.

glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own.'" *Clauss v. Church (In re Church)*, 328 B.R. 544, 547 (B.A.P. 8th Cir. 2005) (quoting *Field*, 516 U.S. at 74). "In other words, if there are any warning signs (i.e., obvious or known falsities, *see* Restatement § 541) either in the documents, in the nature of the transaction, or in the debtor's conduct or statements, the creditor has not justifiably relied on his representation." *Guske v. Guske (In re Guske)*, 243 B.R. 359, 363–364 (citing *Sanford Institution for Savings v. Gallo*, 156 F.3d 71, 75 (1st Cir. 1998)). A creditor's justifiable reliance depends on the "qualities and characteristics of the particular [creditor] . . . and the circumstances of the particular case." *In re Days*, 540 B.R. 423, 428 (Bankr. E.D. Mo. 2015) (quoting *Field*, 516 U.S. at 71); *see In re Ungar*, 633 F.3d 675, 679 (8th Cir. 2011); *see also Evans*, 584 B.R. at 27.

There is no doubt that the Consumers justifiably relied on the representations. CHI was a successful residential construction company for several years. The financial condition of the company was not known to the Consumers at the time of entering into the Residential Construction Agreements. Some heard of the rumors however, after contacting CHI or even Mr. Fawcett, were reassured that the company was doing well and CHI could complete their projects. A few of the Consumers even vetted other residential construction companies before deciding on CHI. Because of this reassurance but primarily the promise to perform, the Consumers paid substantial downpayments at or around the time of signing the Residential Construction Agreements. Most of the Consumers contacted CHI at or around the time of the initial start date to inquire on the status of their projects and were presented with either a new start date or assurance that CHI would complete their projects. When it became apparent that CHI could not adhere to the agreement, the Consumers attempted to rescind but were again told CHI would complete their projects. The Consumers acted as prudently as they could and as any consumer similarly situated would under the circumstances. Therefore, the fourth factor is met.

### E. Causation

The fifth and final factor the State must show is that the Consumers' damages were caused by Mr. Fawcett's misrepresentations. The creditor must establish that the debtor's representations proximately caused the creditor's damages. *Stifel, Nicolaus & Co. v. Smithson (In re Smithson)*, 372

B.R. 913, 922 (Bankr. E.D. Mo. 2007). To do so, "the creditor must demonstrate that its pecuniary loss was a foreseeable result of the debtor's misrepresentation." *In re Smithson*, 372 B.R. at 922 (citing *Gem Ravioli, Inc. v. Creta (In re Creta)*, 271 B.R. 214, 219 (B.A.P. 1st Cir. 2002) (citing Restatement (Second) of Torts § 548A)). Because of CHI's financial condition, Mr. Fawcett knew CHI was unable to begin or even complete the Consumers' projects despite the representations otherwise. Thus, it was foreseeable that the Consumers' projects would not begin and that the Consumers would not receive refunds for their down payments. Therefore, the fifth and final facts is met.

Because the State has proven each factor by a preponderance of the evidence, the Court concludes that the restitution judgment as to the Proven Loss Consumers is nondischargeable.

**III.   11 U.S.C. § 523(a)(7)**

Under Section 523(a)(7), a debtor is not entitled to discharge "to the extent such debt is for a fine, penalty, or forfeiture payable to and for the benefit of a governmental unit and is not compensation for actual pecuniary loss." 11 U.S.C. § 523(a)(7) (2021). Excluded are tax penalties that are either those described in Section 523(a)(1) or "imposed with respect to a transaction or event that occurred before three years before the date of the filing of the petition." *Id*. The purpose of the MMPA is to protect consumers. The credit in the amount of $14,275.23 pursuant to Mo. Rev. Stat. § 407.140.3 and penalty in the amount of $27,000.00 pursuant to Mo. Rev. Stat. § 407.100.6 are nondischargeable.

The statutory provisions are clear. Under § 407.140.3 of the MMPA, Missouri requires a credit to the merchandising practices revolving fund for cases where restitution is awarded. This Court determined the amount in restitution for the Proven Loss Consumers to be $142,522.06. The credit consists of ten percent of the awarded restitution amount, here is $14,252.21. Additionally, under § 407.100.6 of the MMPA, the statute is clear: "the court may award *to the state* a civil penalty of not more than one thousand dollars per violation." This Court determined the civil penalty amount to be $27,000.00. Both the credit and penalty are for the State's benefit. Therefore, the Court concludes that the fine and penalty are nondischargeable.

44

## **CONCLUSION**

Keeping with the purpose of the MMPA, this Court was bound to adhere to Missouri law and precedent in awarding restitution to the Proven Loss Consumers in the amount of $142,752.33, a credit to the State in the amount of $14,275.23, and penalty to the State in the amount of $27,000.00.   Despite the protections afforded to the Consumers under the MMPA, the State was faced with proving by a preponderance of the evidence that the restitution is nondischargeable under 11 U.S.C. § 523(a)(2)(A) and credit and penalty is nondischargeable under 11 U.S.C. § 523(a)(7) – and the State prevailed.

By separate Order, judgment will be entered accordingly.

*Kathy A. Surratt-States*

KATHY A. SURRATT-STATES
United States Bankruptcy Judge

DATED:  October 22, 2024
St. Louis, Missouri

**Copies to:**

| | |
|---|---|
| **Office of the United States Trustee**<br>Thomas F. Eagleton U.S. Courthouse<br>111 South 10th Street, Suite 6.353<br>St. Louis, MO  63102 | **Michelle Lynn Hinkl**<br>Missouri Attorney General's Office<br>815 Olive Street<br>St. Louis, MO 63101 |
| **Jeffrey Mark Fawcett**<br>2005 Moondance Dr.<br>O'Fallon, MO 63368 | **Thomas H Riske**<br>Carmody MacDonald P.C.<br>120 South Central Ave., Ste. 1800<br>St. Louis, MO 63105 |
| **Tyler C Schaeffer**<br>Carmody MacDonald, P.C.<br>120 S. Central Avenue, Suite 1800<br>St. Louis, MO 63105 | |